Terry T. GERRITSEN, an individual, Plaintiff,

v.

WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; Katja Motion Picture Corp., a California corporation; and New Line Productions, Inc., a California corporation, Defendants.

Case No. CV 14–03305 MMM (CWx).

United States District Court, C.D. California.

Signed June 12, 2015.

Glen L. Kulik, Natalie N. Mutz, Kulik Gottesman and Siegel LLP, Sherman Oaks, CA, for Plaintiff.

Ashley K. Pearson, Laura E. Lorenz, Matthew T. Kline, O'Melveny and Myers LLP, Los Angeles, CA, Michelle Inouye Schultz, Warner Bros. Entertainment Inc., Burbank, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

MARGARET M. MORROW, District Judge.

On April 29, 2014, Terry T. Gerritsen filed this action against Katja Motion Pic-

ture Corporation ("Katja"), New Line Productions, Inc. ("New Line"), and Warner Brothers Entertainment, Inc. ("WB") (collectively, "defendants").[1] On June 20, 2014, defendants filed a motion to dismiss Gerritsen's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] The court granted defendants' motion to dismiss with leave to amend on January 30, 2015.[3] Gerritsen filed a timely first amended complaint on February 19, 2015,[4] which defendants moved to dismiss on March 9, 2015.[5] The same day, defendants filed a request that the court consider certain documents purportedly incorporated by reference in Gerritsen's first amended complaint.[6] Gerritsen opposes both defendants' motion and their request that the court consider the allegedly incorporated documents.[7]

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the court finds this matter appropriate for decision without oral argument. The hearing calendared for June 15, 2015, is therefore vacated, and the matter is taken off calendar.

1. Complaint, Docket No. 1 (Apr. 29, 2014).

2. Notice of Motion and Motion to Dismiss Case, Docket No. 8 (June 20, 2014).

3. Order Granting Defendants' Motion to Dismiss ("Order"), Docket No. 25 (Jan. 30, 2015).

4. First Amended Complaint ("FAC"), Docket No. 28 (Feb. 19, 2015).

5. Notice of Motion and Motion to Dismiss Plaintiff's First Amended Complaint ("Motion"), Docket No. 33 (Mar. 9, 2015). See also Reply in Support of Motion to Dismiss Plaintiff's First Amended Complaint ("Reply"), Docket No. 44 (May 6, 2015).

6. Request for Consideration of Sources Incorporated by Reference in Plaintiff's First Amended Complaint ("RJN"), Docket No. 34 (May 9, 2015). See also Reply in Support of

## I. FACTUAL BACKGROUND

### A. Facts Alleged in the First Amended Complaint

#### 1. The Parties

Gerritsen is an international best-selling, award-winning author whose novels have frequently appeared on the New York Times Best Seller list.[8] WB is in the business of developing, producing, distributing, and marketing motion pictures, including the 2013 film *Gravity* (the "Film").[9] Robert Shaye formed New Line in 1967; Shaye and Michael Lynne operated the company as a motion picture studio until February 28, 2008.[10] Gerritsen alleges that New Line created Katja as a wholly owned subsidiary for the purpose of acquiring literary properties and developing screenplays based on those properties.[11] She contends that after Katja developed a screenplay, New Line decided whether to make a film based on the screenplay; if it decided to do so, New Line produced, or designated another related entity to produce, the film.[12]

Gerritsen asserts that since its inception, Katja has been the alter ego of New

Request for Consideration of Sources Incorporated by Reference in Plaintiff's First Amended Complaint ("RJN Reply"), Docket No. 43 (May 6, 2015).

7. Memorandum in Opposition to Motion to Dismiss Plaintiff's First Amended Complaint ("Opposition"), Docket No. 41 (Apr. 29, 2015); Opposition to Request for Consideration of Sources Incorporated by Reference in Plaintiff's First Amended Complaint ("RJN Opp."), Docket No. 42 (Apr. 29, 2015).

8. FAC, ¶ 9.

9. *Id.*, ¶ 10.

10. *Id.*

11. *Id.*, ¶ 11.

12. *Id.*

Line and that there is and has been a complete unity of interest and ownership between the two companies.[13] Katja and New Line allegedly shared and still share the same offices and employees, and operated and still operate under the direction of the same officers and directors.[14] They also allegedly shared the same telephone number.[15] Gerritsen contends that the records of the California Secretary of State reflected the same representative for both New Line and Katja.[16] She also alleges that New Line allegedly made all business decisions for Katja.[17] Gerritsen asserts, on information and belief, that New Line funded Katja's operations and that, other than money New Line provided, Katja had no significant assets or resources and was thus undercapitalized for the business in which it was and is engaged.[18]

Gerritsen maintains that at all times relevant to this lawsuit, WB and New Line (while it was a movie studio) have tried to shield themselves from liability by creating a web of "units" and "divisions."[19] Different units of WB allegedly serve different functions, such as owning the studio lot, acquiring literary material, producing films, and distributing films; Gerritsen contends that, in reality, WB totally controls all of the units.[20] She asserts that, to mislead and frustrate creditors, WB and New Line formed several wholly owned subsidiaries, engaged in mergers, consolidations, and acquisitions with other existing companies, and periodically changed the names of the units.[21] Gerritsen also alleges, on information and belief, that at different times New Line has used the names "New Line Productions, Inc.," "New Line Film Productions, LLC," "New Line Cinema Corporation," "New Line Cinema," "New Line Cinema, LLC," "New Line Cinema Picturehouse Holdings, Inc.," "New Line Distributions, Inc.," "New Line Distribution Services, Inc.," "New Line Home Entertainment, Inc.," "New Line International Releasing, Inc.," "New Line International, Inc.," and "New Line Television, Inc.," several of which are allegedly listed in the records of the California Secretary of State and are active today.[22] WB has allegedly operated under an even larger number of names.[23] Gerritsen contends that WB and New Line have created a business structure so complex that individuals who run the studio frequently cannot keep the entities' relationships and their multiple titles straight.[24]

## 2. General Factual Background

In 1999, Gerritsen completed a novel titled *Gravity* (the "Book"), which was published by Simon and Schuster in September of that year.[25] Gerritsen alleges that the Book, set in orbital space, features a female doctor/astronaut who is stranded alone aboard a space station after disasters kill the rest of the crew; the Book details her struggle to survive.[26] Gerritsen asserts she did extensive research pri-

13. *Id.,* ¶ 12.

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. *Id.,* ¶ 13.

20. *Id.*

21. *Id.*

22. *Id.*

23. *Id.*

24. *Id.*

25. *Id.,* ¶ 14.

26. *Id.*

or to and while writing the Book to ensure that her depiction of NASA technology was realistic.[27] She also maintains that writing the Book was the most daunting challenge of her career, because it involved months of research, which included visiting NASA facilities and conducting interviews.[28]

Based on a manuscript seen by their representatives before the Book was published, Katja and New Line purportedly entered into a written contract with Gerritsen (the "Contract") on March 18, 1999, to purchase motion picture rights to the Book, as well as "any and all versions thereof." [29] The Contract provided that Katja would pay Gerritsen $1,000,000 in exchange for the motion picture rights.[30] It also provided that if Katja produced a motion picture based on the Book, it would pay Gerritsen (1) a $500,000 production bonus and (2) contingent compensation equal to 2.5% of the defined net proceeds of the motion picture.[31] Katja also agreed to give Gerritsen screen credit, on a separate card, in the main titles, and in the billing block of paid advertisements for the Film.[32]

Gerritsen alleges that at the time the Contract was signed, Katja was the alter ego of New Line.[33] She contends that New Line used Katja as part of a comprehensive business strategy to acquire literary material and develop that material into viable motion picture screenplays ready for production; at that point, rights were purportedly assigned to New Line or an entity identified by it so that New Line or the designated entity could produce the film.[34] New Line and Katja allegedly never intended to have Katja produce a motion picture based on Gerritsen's literary property at the time the Contract was signed; rather, they purportedly intended to have it create a screenplay based on the Book under New Line's supervision.[35] Katja and New Line allegedly agreed that if New Line liked the screenplay, Katja would assign rights to the work to New Line or an entity chosen by it.[36] New Line allegedly executed and delivered a Continuing Guaranty of Katja's obligations under the Contract, which guaranteed "full and faithful performance" by Katja.[37]

### 3. The Relationship Between WB, New Line, and Katja

On January 28, 1994, Turner Broadcasting System ("Turner") purportedly purchased New Line and Katja; in 1996, Turner was allegedly purchased by Time Warner.[38] As a result, beginning in 1996, Time Warner allegedly owned two motion picture studios: WB and New Line.[39] At the time Katja and New Line acquired the motion picture rights to Gerritsen's book, therefore, both companies were allegedly owned by Time Warner, which also owned WB.[40]

27. *Id.*

28. *Id.*

29. *Id.,* ¶ 15; see also *id.,* Exh. 1; *Gravity* Purchase Agreement (the "Contract").

30. *Id.,* ¶ 16.

31. *Id.,* see Contract, ¶ 2A.

32. *Id.,* ¶ 16.

33. *Id.,* ¶ 17.

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id.,* ¶ 19.

38. *Id.,* ¶ 20.

39. *Id.*

40. *Id.,* ¶ 21.

On February 28, 2008, Time Warner purportedly caused WB, New Line, and Katja to consolidate.[41] Gerritsen asserts that the reason for the consolidation was that Time Warner did not believe it was efficient or economically viable to own and operate two separate movie studios.[42] She contends, on information and belief, that because Time Warner was the sole owner of WB, New Line, and Katja, neither New Line nor Katja received any consideration in connection with the consolidation; this purportedly left "no money available" for New Line's and Katja's creditors following the consolidation.[43]

On the date of the purported consolidation, Time Warner's Chief Executive Officer ("CEO"), Jeff Bewkes, allegedly sent a publicly disclosed memorandum announcing the consolidation to Time Warner employees, which stated: "Today it was announced that New Line Cinema will be operated as a unit of Warner Bros. Entertainment."[44] The same day, Shaye and Lynne, New Line's departing Co–Chairmen, announced the consolidation in a memorandum to New Line's employees, which was purportedly published in the press. It stated: "This afternoon, Time Warner is announcing that New Line will become a unit of Warner Bros."[45]

Following the consolidation, New Line and Katja purportedly became units of WB.[46] Gerritsen alleges, on information and belief, that the companies have effectively operated as a single entity since the date of the consolidation.[47] She asserts that defendants have held themselves out as a single entity to the public;[48] as evidence of this, she pleads that (1) Time Warner issued press releases announcing the consolidation of WB and New Line and its impact; and (2) Time Warner's Form 10K filed for 2008 stated in part: "FILMED ENTERTAINMENT: ... To increase operational efficiencies and maximize performance within the Filmed Entertainment segment, the Company reorganized the New Line business in 2008 to be operated as unit of Warner Bros."[49]

Gerritsen alleges that since 2008, WB has exercised complete management, control, ownership, and domination over New Line and Katja; she asserts that in acquiring New Line and Katja, WB intended to control the corporations so that they could be used as agencies or instrumentalities of WB.[50] She cites (1) the fact that Shaye and Lynne allegedly departed immediately from Katja and New Line following the consolidation; (2) WB purportedly terminated approximately 450 New Line and Katja employees following the consolidation; and (3) WB allegedly appointed Edward Romano, WB's Chairman, as Katja's Chief Executive Officer.[51]

Gerritsen asserts WB dictated that New Line no longer function as a studio, but rather operate with Katja as a production unit to develop and produce films WB assigned to it or otherwise approved.[52] WB also allegedly caused New Line and Katja to close their New York offices and move from their principal business office at 116 North Robertson Boulevard, Los

41. Id., ¶¶ 22–23.

42. Id., ¶ 25.

43. Id., ¶ 25.

44. Id., ¶ 23.

45. Id., ¶ 24.

46. Id., ¶ 25.

47. Id.

48. Id., ¶ 26

49. Id.

50. Id., ¶ 27.

51. Id., ¶ 28.

52. Id., ¶ 29.

Angeles, California to a studio lot owned by a WB division at 4000 Burbank Boulevard, Burbank, California.[53] WB, New Line, and Katja purportedly now share offices at the studio lot in Burbank and have the same business address.[54]

Gerritsen pleads other facts to support her claim that WB has exercised, and continues to exercise, complete control over New Line and Katja. She asserts that (1) the California Secretary of State's registry of business entities identifies Jillaine Costelloe, a paralegal in the WB legal department, as the contact person for New Line and Katja;[55] (2) if one tries to access New Line's or Katja's websites, he or she is automatically directed to the WB website;[56] (3) New Line and Katja have no telephone number of their own that is accessible to the public, but share WB's main number;[57] and (4) the Boards of Directors of New Line and Katja, on the one hand, and WB, on the other, have several members in common, including Romano, WB's Vice Chairman, who is New Line's Chief Financial Officer and Katja's Chief Executive Officer; John Rogovin, WB's Executive Vice President and General Counsel, who is Secretary of New Line and Katja; and Elizabeth Mason, WB's Senior Vice President of Taxation, who is Katja's Chief Financial Officer.[58] Gerritsen alleges, on information and belief, that other individuals who have served as officers of New Line and Katja since the

consolidation have been WB employees as well.[59]

She asserts that (1) when a profit participant enters into a contract with New Line, the accounting statements he or she receives are issued by WB's Financial Contract Reporting and Administration Department on WB stationery;[60] (2) a profit participant auditing accounting statements must communicate exclusively with WB accounting staff;[61] (3) the WB website directs individuals who desire to license a clip, still, or poster or who seek to license a remake, sequel, stage play, or dialogue rights from New Line to contact a WB department;[62] (4) the business affairs and legal executives of New Line and Katja are located on the WB lot in Burbank and can only be reached through the WB switchboard;[63] (5) when New Line and Katja are sued, they must be represented by attorneys chosen by WB;[64] and (6) in 2011, the New Line logo, which appeared on screen in many New Line motion pictures, began to appear only after the viewer saw a WB shield with a "Warner Bros. Pictures" banner.[65]

Gerritsen contends that from 2008 to the present, WB has directed New Line's business activities.[66] She alleges that (1) WB decides or must approve which films New Line will produce; (2) WB dictates that New Line produce certain genre-specific films; (3) WB assigns films from other genres to its other production unit, "War-

---

53. *Id.,* ¶ 30.

54. *Id.*

55. *Id.,* 31.

56. *Id.,* ¶ 32.

57. *Id.,* ¶ 33.

58. *Id.,* ¶ 34.

59. *Id.,* ¶ 35.

60. *Id.,* ¶ 36.

61. *Id.*

62. *Id.,* ¶ 37.

63. *Id.,* ¶ 39.

64. *Id.,* ¶ 40.

65. *Id.,* ¶ 38.

66. *Id.,* ¶ 41.

ner Bros. Pictures"; (4) WB determines how many films New Line will produce annually, and has altered the number periodically since consolidation; and (5) all movies produced by New Line must be distributed by WB.[67]

WB also purportedly controls New Line's former record label. Prior to 2008, New Line allegedly owned and operated a record label known as New Line Records.[68] Gerritsen contends that in December 2010, WB announced it would assume control and change the name of the label to WaterTower Music.[69] WB's website purportedly states: "WaterTower Music, Warner Bros.' in-house music label, was launched in January 2010 as a reimagining and rebranding of New Line Records to create music assets as diverse as the films, television shows, and interactive games they support. Housed on the Burbank lot, in the offices occupied by Warner Bros. Records during its heyday in the 1960s … allows [WaterTower Music] to easily and efficiently communicate with colleagues across any Warner Bros. division."[70] Gerritsen alleges that soundtracks from all WB films and television programs, including those produced by New Line, are sold at WB's discretion through WaterTower Music.[71] She also asserts, on information and belief, that the music that appears in New Line productions is arranged and produced by WB employees.[72]

Gerritsen contends that WB regularly speaks for and on behalf of New Line in the media, as evidenced by (1) WB's announcement on May 14, 2014, that New Line would produce a film titled *IT*, which was originally going to be produced by WB's other motion picture studio, WB Pictures; (2) WB's announcement on October 15, 2014, that WB had entered into a contract with DC Comics pursuant to which New Line was going to produce films based on comic book characters; (3) WB's announcement on May 8, 2014 that it would partner with MGM to co-produce a Reese Witherspoon/Sofia Vergara film and assign production to New Line; (4) WB's announcement on November 18, 2014 about the success of New Line's film, *Annabelle*; (5) the purported fact that domestic box office performance reports for WB films do not differentiate between WB Pictures and New Line films; and (6) the alleged fact that, since 2008, any news article that mentions New Line always notes that New Line is a unit of WB.[73]

A written agreement dated January 1, 2010, allegedly provides that all intellectual property acquired by New Line at any time will automatically be deemed to have been transferred to and owned by WB.[74] WB purportedly paid no consideration for this agreement and did not promise to pay any future consideration.[75] Rather, the purported purpose of the agreement was "solely to vest in [WB] the benefits of specific rights-related provisions of Content Agreements," and to ensure that "[WB] assume[d] no obligations under such … Agreements."[76]

Based on these allegations, Gerritsen contends that a *de facto* merger of WB, New Line, and Katja occurred in 2008, that WB is a continuation of New Line and Katja, and that it is legally responsible for

---

67. *Id.*

68. *Id.,* ¶ 42.

69. *Id.*

70. *Id.*

71. *Id.*

72. *Id.*

73. *Id.,* ¶¶ 43, 45.

74. *Id.,* ¶ 44.

75. *Id.*

76. *Id.,* ¶ 45.

those companies' obligations under the Contract and Guaranty.[77] Gerritsen also asserts that New Line and Katja have been and are WB's alter egos.[78] She contends that WB's owns Katja's and New Line's stock so that it can control them and use them as its agencies or instrumentalities.[79] Finally, Gerritsen maintains that Katja has been and is undercapitalized for the business in which it is engaged and that the company's funds and resources are commingled with WB's funds and resources and are under WB's sole and complete control.[80]

### 4. Development of the Film

Following its acquisition of motion picture rights to the Book, Katja purportedly sought to develop a film based on the Book with New Line and Artists Production Group ("APG");[81] APG is the production affiliate of management company Artists Management Group ("AMG").[82] Gerritsen asserts it is common that, while a screenplay is being written, a director is "attached" to the project to supervise screenplay creation; this individual has access to the literary work upon which the screenplay is to be based.[83] She contends, on information and belief, that writer and director Alfonso Cuarón was attached to the project of writing a screenplay based on the Book.[84] Gerritsen asserts she was not told that Katja had attached Cuarón to the project,[85] and alleges, on information and belief, that Cuarón first became aware of and had access to the Book because he was a client of AMG; this allegedly entitles him to an option on films APG planned to develop.[86]

To assist with the screenplay, Gerritsen allegedly wrote additional scenes in which satellite debris collided with the International Space Station, destroying it and leaving the female doctor/astronaut drifting in a space suit searching for ways to return to Earth.[87] Under terms of the Contract, Katja allegedly owned this additional written work.[88] Gerritsen contends she delivered the additional scenes to AMG and APG, which retained possession of them, and purportedly shared them with New Line, Katja, and Cuarón.[89] She asserts, on information and belief, that sometime after 2002, Cuarón and his son, Jonas Cuarón, wrote a screenplay titled *Gravity* (the "Cuarón Gravity Project"), which featured the same characters and storyline as Gerritsen's book and the additions thereto.[90]

On December 17, 2009, the Cuaróns allegedly granted all rights in the Cuarón Gravity Project to WB, which in turn assigned or allowed its Warner Bros. Picture unit, rather than New Line, to produce the Film.[91] In 2011, Warner Bros. Pictures began production of the Film, with Cuarón as director.[92] The project was allegedly

77. *Id.*, ¶ 46.

78. *Id.*, ¶ 47.

79. *Id.*

80. *Id.*, ¶ 47.

81. *Id.*, ¶ 49.

82. *Id.*

83. *Id.*

84. *Id.* ¶ 50

85. *Id.*

86. *Id.*

87. *Id.*, ¶ 51.

88. *Id.*

89. *Id.*

90. *Id.*, ¶ 52.

91. *Id.*, ¶ 53.

92. *Id.*, ¶ 54.

supervised by Lynn Harris, WB's Executive Vice President of Production and New Line's Vice President of Production; Harris allegedly served as New Line's Executive Vice President from 2000 to 2002.[93] The Film includes scenes of satellite debris colliding with the International Space Station; as a result, a female astronaut is set adrift in space, and desperately seeks a way to return to Earth.[94] The screenplay credit on the Film states that it was "[w]ritten by Alfonso Cuarón and Jonas Cuarón."[95] Gerritsen alleges that, by including such a credit, WB represented to the public that the Film's concept and story line originated with the Cuaróns.[96] The Film was released in the United States on October 4, 2013, and to date has reported box office gross revenue of more than $700,000,000.[97] The Film won seven Oscars.[98]

#### 5. Gerritsen's Claims

Gerritsen pleads claims for breach of written contract against Katja and WB,[99] and breach of guaranty against New Line and WB.[100] She seeks an accounting from all defendants.[101]

### B. Defendants' Request That the Court Consider Documents Purportedly Incorporated by Reference in the First Amended Complaint

Defendants ask that the court consider twelve documents to which Gerritsen makes reference and on which she purportedly relies in the first amended complaint under the incorporation by reference doctrine.[102] These include (1) an Assignment Agreement dated January 1, 2010 between New Line and WB;[103] (2) a Time Warner press release dated February 28, 2008, captioned "Time Warner Consolidates Film Entertainment Business";[104] (3) an article written by Nikki Finke, titled "Toldja! New Line Folds Into Warner Bros; Bob Shaye & Michael Lynne Exit; Read All the Interoffice Memos Here," which appeared on the *Deadline Hollywood* website on February 28, 2008;[105] (4) an article written by Peter Sciretta, titled "Breaking: Warner Bros. Absorbs New Line Cinema," which appeared on *Slashfilm.com* on February 28, 2008;[106] (5) an article written by Louis Hau, titled "New Line, Warner Bros. to Merge Operations," which appeared on Forbes.com on February 28, 2008;[107] (6) an article by Claudia Eller, titled "New Line, Old Story: A Small Studio Fails," which appeared in *The Los Angeles Times* on February 29, 2008;[108] (7) the Form 10–K Time Warner filed with the Securities and Exchange Commission on February 20, 2009;[109] (8) an

---

93. *Id.*

94. *Id.*

95. *Id.*

96. *Id.*

97. *Id.*

98. *Id.*

99. *Id.*, ¶¶ 57–62.

100. *Id.*, ¶¶ 63–70.

101. *Id.*, ¶¶ 71–76.

102. RJN at 1.

103. RJN at 3; Declaration of Matthew T. Kline in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and in Support of Defendants' Request That the Court Consider and/or Judicially Notice Sources Incorporated by Reference in Plaintiff's First Amended Complaint ("Kline Decl."), Docket No. 35 (Mar. 9, 2015), Exh. A.

104. RJN at 3–4; Kline Decl., Exh. B.

105. RJN at 4–5; Kline Decl., Exh. C.

106. RJN at 5; Kline Decl., Exh. D.

107. RJN at 5–6; Kline Decl., Exh. E.

108. RJN at 6; Kline Decl., Exh. F.

109. RJN at 7; Kline Decl., Exh. G.

excerpt of a letter from WB's Michelle Schultz to Christine Cuddy, Gerritsen's lawyer, on April 25, 2014;[110] (9) an article by the *Hollywood Reporter's* Borys Kit, titled "Stephen King 'It' Moves from Warner Bros. to New Line (Exclusive)," which appeared on May 21, 2014;[111] (10) a Time Warner press release dated October 15, 2014, captioned "Warner Bros. Details Strategic Content Plans at Time Warner Investor Conference,";[112] (11) a Time Warner press release dated November 18, 2014, captioned "New Line Cinema's 'Annabelle' is Unstoppable, Passing $250 Million in Global Box Office";[113] and (12) an article by Mike Fleming Jr., titled "URGENT: Warner Bros Downsizing New Line," which appeared on the *Deadline Hollywood* website on February 22, 2011.[114] With the exception of the Assignment Agreement, Gerritsen opposes the request that the court consider these documents.[115]

 In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings".

 The incorporation by reference doctrine "permits a district court to consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." *In re Silicon Graphics Inc.*

*Securities Litigation*, 183 F.3d 970, 986 (9th Cir.1999) (citing *Branch*, 14 F.3d at 454); see *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005) ("[The Ninth Circuit] ha[s] extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of the document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint," citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998)); *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir.2003) ("A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment"); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (a court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994) (noting that a court may consider a document whose contents are alleged in a complaint, so long as no party disputes its authenticity), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F.Supp.2d 890, 897 (C.D.Cal.2014) ("The Ninth Circuit has extended the incorporation by reference doc-

---

**110.** RJN at 8; Kline Decl., Exh. H.

**111.** RJN at 8; Kline Decl., Exh. I.

**112.** RJN at 9; Kline Decl., Exh. J.

**113.** RJN at 9; Kline Decl., Exh. K.

**114.** RJN at 9; Kline Decl., Exh. L.

**115.** RJN Opp. at 1–3.

trine to situations in which the plaintiff's claim depends on the contents of the document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document" (citations omitted)).

■ Gerritsen objects to defendants' request that the court consider the documents because "the factual allegations in the FAC are supported by a multitude of sources which go far beyond those few which are identified by [d]efendants" and "cannot be disproved by simply citing to a handful of handpicked publications with choice phrases."[116] Defendants, however, do not assert that these documents, in isolation, are the only materials on which Gerritsen relies; they merely request that the court consider the entirety of the documents, which they assert Gerritsen "handpicked" to cite in her first amended complaint.[117] The fact that Gerritsen may have relied on other information in pleading her first amended complaint does not preclude the court from considering documents whose contents are alleged in the complaint because Gerritsen's claims depend, in part, on those contents. *Kythera Biopharmaceuticals, Inc.*, 998 F.Supp.2d at 897.

Gerritsen next objects to "[d]efendants[' attempt] improperly [to] carve out select portions of the [eleven] documents . . . they wish the [c]ourt to 'incorporate' into the" first amended complaint. While it is true, as Gerritsen observes, that defendants highlight portions of the documents they contend are inconsistent with her allegations in the amended complaint,[118] this does not require that the court decline to consider the documents. To the extent the documents have been incorporated by reference in the first amended complaint—a subject the court discusses *infra*—the court can consider each document *in its entirety* and not rely solely on the excerpts plaintiff pleads or those defendants highlight in their motion.

■ Finally, Gerritsen objects to each document on the grounds that "the contents of the articles are inadmissible hearsay, and at times they are double hearsay, to the extent they are introduced for the truth of the matters asserted."[119] To the extent a document has been incorporated by reference in a complaint, however, the court "may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir.2012); see also *In re Turbodyne Techs., Inc. Securities Litigation*, No. CV 99–000697 MMM (BQRx), 2000 WL 33961193, *10 (C.D.Cal. Mar. 15, 2000) ("By incorporating the documents, plaintiffs have made the allegations their own, and they must thus be considered true for purposes of this motion to dismiss" (citation omitted)). Stated differently, to the extent they were incorporated by reference in the complaint, the documents are not evidence, but allegations Gerritsen has made.

Turning to the documents themselves, Gerritsen does not dispute that the 2010 Assignment Agreement was explicitly referenced and incorporated in the first amended complaint.[120] Accordingly, the court will consider the Agreement in ruling on defendants' motion. It is unclear whether Gerritsen agrees that she incorpo-

---

116. RJN Opp. at 1.

117. RJN Reply at 2 n. 1.

118. See RJN at 3–9.

119. RJN Opp. at 3.

120. See *id.* at 3 ("Exhibit A was properly incorporated by reference in the FAC, i.e., paragraph 44 explicitly cites to the document and its contents").

rated the remaining documents by reference in her complaint. She asserts that *"[m]ost of* the documents are not 'explicitly' referenced in the FAC";[121] this suggests she concedes that some were "explicitly referenced." She fails to identify which documents were referenced/incorporated and which were not, however. Instead, she makes general objections—e.g., "in some instances, [d]efendants attach the wrong articles and in others they attach one of multiple articles from which facts alleged in the FAC were derived."[122] The court must thus consider the documents *seriatim.*

 The court agrees with Gerritsen that the February 28, 2008, Time Warner press release—which is Exhibit B to defendants' request—was not incorporated by reference in the first amended complaint. Although the complaint mentions the release in passing,[123] it does not reference its contents, nor rely on its issuance as affirmative support for Gerritsen's claims. Instead, it appears that Gerritsen's reference to the press release merely supports her allegation that defendants consolidated the day the release was issued.[124] As courts have recognized, merely mentioning the existence of a document does not satisfy the incorporation by reference standard. See, e.g., *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir.2010) ("[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document," citing *Ritchie,* 342 F.3d at 908–09); *F.T.C. v. Amazon.com, Inc.,* 71 F.Supp.3d 1158,

1161 (W.D.Wash.2014) (declining to deem a document incorporated by reference as it was "[o]nly once ... tangentially mention[ed]" in the complaint). It cannot fairly be said that Gerritsen did anything more than reference the existence of the press release in the first amended complaint. The court therefore concludes that it was not incorporated by reference and declines to consider the document in its entirety.

Exhibit C to defendants' request is a *Deadline Hollywood* article that attached internal WB and New Line memoranda regarding the purported consolidation of the companies in 2008. The court agrees that the attachments to the article are properly considered under the incorporation by reference doctrine. Gerritsen cites extensively from each memorandum in the first amended complaint.[125] She relies on statements in the documents, moreover, as support for the vicarious liability theories she pleads.[126] Gerritsen does not dispute the authenticity of the memoranda, and consequently, the court will consider them in their entirety in deciding defendants' motion to dismiss. See *Kythera Biopharmaceuticals, Inc.,* 998 F.Supp.2d at 897.

Exhibit D is a *Slashfilm.com* article by Peter Sciretta published on February 28, 2008. Gerritsen referenced the existence of the article in her complaint.[127] Although she contends she did so "not for the truth of [its] content but to illustrate [d]efendants' characterization of the February 28, 2008, consolidation,"[128] she relies

---

**121.** *Id.* at 2 (emphasis added).

**122.** *Id.* at 1–3.

**123.** See FAC, ¶ 23 ("Time Warner announced the consolidation in a press release dated February 28, 2008").

**124.** *Id.,* ¶ 22.

**125.** See FAC, ¶¶ 23–24.

**126.** See Opposition at 2, 8, 17.

**127.** Compare FAC, ¶ 26 ("Another [major publication] proclaimed, 'Warner Bros. Absorbs New Line Cinema'") with Kline Decl., Exh. D at 1.

**128.** RJN Opp. at 1.

on the truth of the article's title—that New Line was completely absorbed by WB—in her complaint. In her opposition, moreover, she asserts that the contents of the article are consistent with the title.[129] The court therefore concludes it is appropriate to consider the entirety of the article to provide appropriate context for the title on which Gerritsen relies. As Gerritsen does not dispute the authenticity of the document, the court deems Exhibit D incorporated by reference in the first amended complaint and will consider it in deciding defendants' motion.

The court will also consider the next two documents—the *Forbes* article by Louis Hau (Exhibit E) and the *Los Angeles Times* article by Claudia Eller (Exhibit F). Although Gerritsen does not expressly cite the articles, she quotes extensively from each, and cites the source of the quotations as *Forbes* and the *Los Angeles Times* respectively.[130] A comparison of the quotations in the first amended complaint with the articles attached to defendants' request confirms that these articles were the sources Gerritsen referenced in the complaint; Gerritsen does not argue otherwise, nor does she dispute the authenticity of the documents.

The court will also consider Exhibit G, as Gerritsen cites and relies on the contents of Time Warner's Form 10–K report for 2008 in the complaint.[131] The court, however, declines to consider Exhibits H and I. Defendants maintain that Exhibit H, which is an April 25, 2014, letter from WB's Michelle Schultz to Gerritsen's counsel, Christine Cuddy, is referenced in paragraph 56 of the first amended complaint.[132] Gerritsen, however, disputes this, asserting that it is merely "one pre-litigation communication," and that defendants have "ignor[ed] others that contributed to ... the allegations in paragraph 55 and 56 of the" amended complaint.[133] Defendants do not dispute that the letter is not the sole pre-litigation communication between the parties; instead, they contend it is the "primary written communication between plaintiff and defendants concerning this lawsuit."[134] The extent to which other communications exist that formed the basis for Gerritsen's allegations is unclear. Because the first amended complaint does not explicitly reference the letter, and because the allegation that apparently concerns it is not material to the court's ultimate decision of defendants' motion, the court declines to consider Exhibit H. Turning to Exhibit I, Gerritsen pleads that "*on May 14, 2014,* WB announced that a film called 'IT,' based on a book by Stephen King, which was originally going to be produced by WB Pictures, would be moved to and produced by New Line instead."[135] The *Hollywood Reporter* article defendants proffer is dated May 21, 2014, not May 14.[136] Although defendants note that the article is an "exclusive,"[137] the date on which it appeared does not coincide with that pled in the first amended complaint. Accordingly, the court declines to consider Exhibit I.

Gerritsen cites the final three documents—an October 15, 2014, Time Warner press release (Exhibit J), a November 18, 2014, Time Warner press release (Exhibit

---

**129.** See, e.g., Opposition at 5, 7–8.

**130.** See FAC, ¶ 26.

**131.** See *id.*

**132.** RJN at 8.

**133.** RJN Opp. at 2.

**134.** RJN Reply at 4.

**135.** FAC, ¶ 43.

**136.** See Kline Decl., Exh. I.

**137.** RJN Reply at 3–4.

K), and a *Deadline Hollywood* article published on February 22, 2011 (Exhibit L)—in the first amended complaint and relies on them as support for her breach of contract and breach of guaranty claims. She does not dispute their authenticity. She cites the content of each press release,[138] and relies on it to demonstrate that WB routinely makes media announcements on New Line's behalf, and does not distinguish itself from New Line.[139] Because Gerritsen relies on the press releases, and does not dispute that the documents attached to defendants' request are authentic, the court will consider the entirety of the press releases in deciding defendants' motion. As for Exhibit L, although Gerritsen does not expressly cite it, she quotes from the article throughout the complaint,[140] and relies on those allegations as support for her claims.[141] Because the article's authenticity is not in dispute, the court will consider the entirety of the article under the incorporation by reference doctrine.

In sum, the court grants defendants' request to consider Exhibits A, C, D, E, F, G, J, K, and L as incorporated by reference in Gerritsen's first amended complaint. It declines to consider Exhibits B, H, and I.

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pa-*

*cifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 553–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise the right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

---

138. See FAC, ¶ 43.

139. See Opposition at 5, 7–8.

140. Compare FAC, ¶ 41 with Kline Decl., Exh. L at 1.

141. See Opposition at 1, 5–8, 10.

content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

### B. Gerritsen's Breach of Contract and Breach of Guaranty Claims

### 1. Legal Standard Governing Breach of Contract and Breach of Guaranty Claims

To state a breach of contract claim, a party must allege the existence of a contract; performance under the contract or an excuse for nonperformance; defendant's breach; and resulting damages. *Alvarado v. Aurora Loan Services, LLC,* No. SACV 12–0524 DOC (JPRx), 2012 WL 4475330, *4 (C.D.Cal. Sept. 20, 2012) (citing *McKell v. Washington Mutual, Inc.,* 142 Cal.App.4th 1457, 1489, 49 Cal.Rptr.3d 227 (2006)). California courts apply the same standard to breach of guaranty claims. See *MRW, Inc. v. Big-O Tires, LLC,* No. CIV S–08–1732 LKK/ DAD, 2009 WL 3368438, *9 (E.D.Cal. Oct. 16, 2009) ("An action for breach of guaranty is a species of claim for breach of contract"); see also *Harrison Ventures, LLC v. Alta Mira Treatment Center, LLC,* No. C 10–00188 RS, 2010 WL 1929566, *5 (N.D.Cal. May 12, 2010) ("With regard to the breach of guaranty claim against Cartwright, such a breach occurs when a debt falls due and remains unpaid. Here, absent a breach by defendants, no such unpaid debt arises. The breach of guaranty claim against Cartwright is therefore wholly dependent upon the viability of the FAC's breach of contract claims. As those claims have been dismissed with leave to amend, the same fate must befall the breach of guaranty claim," citing *California First Bank v. Braden,* 216 Cal.App.3d 672, 677, 264 Cal.Rptr. 820 (1989)). As Gerritsen's breach of contract and breach

of guaranty claims are governed by the same standard and the parties address the claims jointly in their briefs, the court considers them in tandem below.

### C. Whether Gerritsen Has Plausibly Alleged Breach of Contract and Breach of Guaranty Claims

### 1. Gerritsen's Direct Liability Theories

In its order dismissing Gerritsen's original complaint, the court concluded that, as pled, Gerritsen's complaint failed to state a claim for either breach of contract or breach of guaranty on a direct liability theory. It stated:

> "Even when her allegations are construed in Gerritsen's favor, it is apparent that she cannot plausibly allege a claim under traditional contract law theories. Gerritsen pleads that she entered into contracts with Katja and New Line that entitled her to payment if Katja produced a motion picture based on her book; and that WB, not Katja, produced the Film that is allegedly "based on" the Book. No plausible inference arises from these allegations that WB was a party to the contracts or that Katja produced the Film. Thus, absent an alternative theory of liability, Gerritsen's claims must be dismissed." [142]

In her opposition to defendants' motion to dismiss the first amended complaint, Gerritsen advances two bases on which each defendant is directly liable for breach of contract and/or breach of guaranty.[143] She argues first that "Katja and New Line are liable ... for breach of the implied covenant of good faith and fair dealing because they failed to take necessary actions to ensure Gerritsen received the benefits of the Contract." [144] She states that she, Katja, and New Line "all understood

---

**142.** Order at 30.

**143.** Opposition at 22–25.

**144.** *Id.* at 22.

at the time the Contract was executed that if a 'Picture' ... was produced, Katja would not produce it." As a result, she contends, "Katja and New Line knew Gerritsen would rely on them to secure and enforce [her] right to credit and payment under the Contract if a third party, e.g., W.B., made a film based on the Book." [145] Defendants contend that Gerritsen's breach of the implied covenant claims are "new claims" that exceed the scope of leave to amend granted by the court in its prior order.[146] The court agrees.

Although Gerritsen does not plead the claims as independent causes of action,[147] California law is clear that breach of implied covenant claims are independent of claims for breach of the underlying contract. See, e.g., *Boyd v. Avanquest North America Inc.*, No. 12–cv–04391–WHO, 2014 WL 7183988, *2 (N.D.Cal. Dec. 16, 2014) ("Under California law, '[t]he elements of a cause of action for breach of contract are: (1) a contract; (2) plaintiff's performance; (3) defendant's breach and (4) damage to plaintiff therefrom.' Regarding the fourth cause of action, '[u]nder California law, a breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself'" (citations omitted)); *May v. Semblant, Inc.*, No. 5:13–CV–01576–EJD, 2013 WL 5423614, *6 (N.D.Cal. Sept. 27, 2013) ("In California,

breach of contract and breach of the implied covenant of good faith and fair dealing are two distinct claims," citing *Swearengin v. Continental Ins. Co.*, No. CV 02–5281 EFS (SHx), 2002 WL 34439648, *3 (C.D.Cal. Oct. 3, 2002)); *Bilodeau v. McAfee, Inc.*, No. 12–CV–04589–LHK, 2013 WL 3200658, *13 (N.D.Cal. June 24, 2013) (analyzing a breach of the implied covenant claim separately from a breach of contract claim); *Black & Veatch v. Modesto Irr. Dist.*, No. CV F 11–0695 LJO SKO, 2011 WL 2636218, *6 (E.D.Cal. July 5, 2011) ("Under California law, a breach of the [implied] covenant may be pleaded and adjudicated as a distinct cause of action," citing *State Farm Mutual Automobile Ins. Co. v. Superior Court*, 114 Cal.App.4th 434, 453, 8 Cal.Rptr.3d 56 (2003)); *Ledwidge v. Ziehm Imaging, Inc.*, No. EDCV 11–00217 VAP (OPx), 2011 WL 836446, *1 (C.D.Cal. Mar. 9, 2011) ("[I]t appears that although Plaintiffs state expressly only a breach of contract claim, Plaintiffs' claim contains two separate claims: (1) breach of the express contract; and (2) breach of the implied covenant of good faith and fair dealing"); *Greenwich Ins. Co. v. Rodgers*, 729 F.Supp.2d 1158, 1162–64 (C.D.Cal. 2010) (analyzing breach of contract and breach of the implied covenant claims as distinct causes of action).

As a result, and notwithstanding Gerritsen's suggestions to the contrary,[148]

145. *Id.* at 23.

146. Reply at 23–24.

147. See FAC, ¶¶ 60, 67.

148. Opposition at 23–24. Gerritsen argues that "[b]reach of the implied covenant of good faith and fair dealing is not a 'new claim'" because "claims for breach of contract were part of [her] original complaint." (Opposition at 23.) While "the cause of action for breach of the implied covenant arises out of the contract itself," *Brown v. Greyhound Lines, Inc.*, No. C–94–02874 MHP, 1996 WL 45420, *8 (N.D.Cal. Jan. 31, 1996)

(citing *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683, 254 Cal.Rptr. 211, 765 P.2d 373 (1988)), and while, "[w]ithout a contractual underpinning, there is no independent claim for breach of the implied covenant," *Fireman's Fund Insurance Co. v. Maryland Casualty Co.*, 21 Cal.App.4th 1586, 1599, 26 Cal.Rptr.2d 762 (1994), the fact that a breach of the implied covenant claim must be based on an underlying contract does not mean it is equivalent to a claim alleging breach of that contract. Indeed, "'[u]nder California law, a breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself.'" *Boyd,*

the breach of implied covenant claims she now seeks to pursue against Katja and New Line—which were not pled in her original complaint—are "new claims" that exceed the scope of leave to amend granted by the court. The court cautioned Gerritsen that "[she could] not plead new claims" and that, "[s]hould the scope of any amendment exceed the leave to amend granted ..., the court [would] strike the offending portions of the pleading under Rule 12(f)." [149] Because Gerritsen pleads new breach of the implied covenant claims against Katja and New Line that exceed the leave to amend granted, the court strikes these portions of Gerritsen's breach of contract and breach of guaranty claims. See *DeLeon v. Wells Fargo Bank, N.A.*, No. 10–CV–01390–LHK, 2010 WL 4285006, *3 (N.D.Cal. Oct. 22, 2010) ("In cases like this one ... where leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken"); see also *Kennedy v. Full Tilt Poker*, No. CV 09–07964 MMM (AGRx), 2010 WL 3984749, *1 (C.D.Cal. Oct. 12, 2010) (noting that the court had stricken a third amended complaint because plaintiffs' new claims and the addition of new defendants "exceeded the authorization to amend the court granted"

and plaintiffs had not sought leave to add new claims or defendants as required by Rule 15); *Barker v. Avila*, No. 2:09–cv–0001 GEB–JFM, 2010 WL 3171067, *1–2 (E.D.Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims); *PB Farradyne, Inc. v. Peterson*, No. C 05–3447 SI, 2006 WL 2578273, *3 (N.D.Cal. Sept. 6, 2006) (striking, without leave to amend, a new theory of liability alleged in third amended complaint because the new claim was "outside the scope of the leave to amend granted" when the court dismissed the second amended complaint); *Serpa v. SBC Telecommunications, Inc.*, No. C 03–4223 MHP, 2004 WL 2002444, *3 (N.D.Cal. Sept. 7, 2004) (striking a claim asserted for the first time in an amended complaint, since the new claim exceeded the scope of the court's order granting limited leave to amend).

■ Gerritsen also argues that Warner Brothers is directly liable for breach of the Contract.[150] She contends that because WB benefited from the Contract by purportedly making the Film based on the Book, it is estopped from disclaiming liabilities incurred under the Contract under California Civil Code §§ 1589 and 3521.[151] As defendants note,[152] this theory of "direct liability" is not pled; the allegations in

2014 WL 7183988 at *2 (quoting *Lopez v. Jefferson Pilot Financial Insurance Co.*, 149 Fed.Appx. 704, 705 (9th Cir.2005) (Unpub.Disp.)). Gerritsen cites no authority for the proposition that breach of the implied covenant and breach of contract are not separate causes of action, and California law is clear that this is not the case.

149. Order at 47.

150. Opposition at 24–25 "Because WB benefitted from the Contract when it made the Film based on the Book, it is estopped from disclaiming liabilities. Under sections 1589 and 3521 of the California Civil Code, an assumption of liability will be implied as a matter of law when a party accepts the rights

and privileges of a contract, which is precisely what happened in this case".

151. Section 1589 provides: "ASSUMPTION OF OBLIGATION BY ACCEPTANCE OF BENEFITS: A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." CAL. CIV. CODE § 1589. Civil Code § 3521 states: "He who takes the benefit must bear the burden." CAL. CIV.CODE § 3521.

152. Reply at 25 ("This theory appears nowhere in either of her complaints or prior Rule 12 briefing and should be stricken as doubly defying the Court's prior order").

the first amended complaint concern various vicarious liability theories.[153] Indeed, Gerritsen expressly disclaims other theories, stating that "WB and Katja [or New Line] are liable to Gerritsen under the Contract [or Guaranty] based on the following theories"—she then lists vicarious liability theories.[154] As courts routinely recognize, it is improper for a plaintiff to assert an unpled theory of liability in opposition to a defendant's Rule 12(b)(6) motion to dismiss. See, e.g., *Nathanson v. Polycom, Inc.*, 87 F.Supp.3d 966, 985 (N.D.Cal. 2015) ("Plaintiff argues in his opposition brief that Item 402 of SEC Regulation S-K required Polycom to disclose all compensation provided to Miller in Form 10–Ks and proxy statements. However, Plaintiff has not pleaded these allegations in his Complaint. As a result, the Court does not address them," citing *Bruton v. Gerber Prods. Co.*, 961 F.Supp.2d 1062, 1078 (N.D.Cal.2013)); *Elizabeth L. v. Aetna Life Insurance Co.*, No. CV 13–2554 SC,

2014 WL 2621408, *4 (N.D.Cal. June 12, 2014) (refusing to consider unpled theories of liability raised for the first time in opposition to defendant's motion to dismiss). Cf. *Bates v. Bankers Life and Cas. Co.*, 993 F.Supp.2d 1318, 1336 (D.Or.2014) (considering a plaintiff's "novel, unpled theory" of liability only after plaintiff filed an amended complaint incorporating the theory). The court therefore declines to consider Gerritsen's unpled theories as to why WB is directly liable for breach of contract and/or breach of guaranty. This is particularly appropriate as the first amended complaint explicitly identifies the theories on which the claims are based.[155]

### 2. Gerritsen's Vicarious Liability Theories

Gerritsen asserts that WB is liable for Katja's obligations under the Agreement and New Line's obligations under the Guaranty on (1) a successor-in-interest theory;[156] (2) an alter ego theory;[157] and

---

153. See FAC, ¶¶ 59, 66.

154. *Id.*

155. Defendants contend that Gerritsen's arguments are beyond the scope of leave to amend granted in the court's order dismissing the original complaint. They assert "the [c]ourt already ruled[ that] plaintiff 'cannot plausibly allege a claim [against WB] under traditional contract law theories' because there is '[n]o plausible inference ... that WB was a party to the contracts." For this reason, they assert, leave to amend was granted solely as to Gerritsen's vicarious liability theories. (Reply at 24–25.) Defendants are mistaken. While the court found that Gerritsen had not pled plausible direct liability claims for breach of contract and breach of guaranty in the original complaint (Order at 30), the leave to amend that was granted was not as limited as defendants contend. Rather, the court granted Gerritsen leave to file an amended complaint that "remed[ied] the deficiencies ... noted in [the] order." This included her direct liability theories. (Order at 47.) The fact that Gerritsen could have pursued direct liability theories, however, is moot at this

point, as Gerritsen failed to allege such theories in her first amended complaint.

156. Opposition at 16–22; see also FAC, ¶¶ 59(a)-(c) ("WB and Katja are liable to Gerritsen under the Contract based on the following theories: (a) By virtue of the consolidation of WB and Katja in 2008, WB became the successor-in-interest of Katja; (b) Under the terms of the contracts and related documents that were signed on or about February 28, 2008, WB and Katja consolidated and WB expressly or impliedly assumed the obligations in the Contract, such that WB is obligated to perform the duties owed to Gerritsen by Katja under the Contract; (c) When Katja was consolidated with WB in 2008, WB became the mere continuation of Katja"); *id.*, ¶¶ 66(a)-(c) ("WB and New Line are liable to Gerritsen under the Guaranty based on the following theories: (a) By virtue of the consolidation of WB and New Line in 2008, WB became the successor-in-interest of New Line; (b) Under the terms of the contracts and related documents that were signed on or about February 28, 2008, WB and New Line consolidated and [WB] expressly or implied as-

(3) an agency theory.[158] The court considers each in turn.

### a. Successor–in–Interest Liability

#### (1) Legal Standard Governing Successor–in–Interest Liability

 Gerritsen alleges that WB is the parent company of Katja and New Line. Parent corporations can be held liable for their own unlawful acts, the unlawful acts of subsidiary companies that act as their agents, and the unlawful acts of predecessor companies. See *United States v. Bestfoods*, 524 U.S. 51, 64–65, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir.2001); *Monaco v. Bear Stearns Cos.*, No. CV 09–05438–SJO (JCx), 2011 WL 4059801, *19 (C.D.Cal. Sept. 12, 2011).

 Under California law, "a successor company has liability for a predecessor's actions if: (1) the successor expressly or impliedly agrees to assume the subject liabilities ... [;] (2) the transaction amounts to a consolidation or merger of the successor and the predecessor[;] (3) the successor is the mere continuation of the predecessor[;] or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts." *No Cost Conference, Inc. v. Windstream Communications, Inc.*, 940 F.Supp.2d 1285, 1299 (S.D.Cal.2013) (citing *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal.App.4th 1101, 1120, 69 Cal.Rptr.3d 202 (2007)); *see City of Los Angeles v. Wells Fargo & Co.*, 22 F.Supp.3d 1047, 1062 (C.D.Cal.2014).

#### (2) Whether Gerritsen Has Adequately Alleged Successor–in–Interest Liability

##### (a) Assumption

 To allege that a company is a successor-in-interest because it expressly or impliedly agreed to assume the liabilities of a predecessor, plaintiff "must not only plead the existence of an assumption of liability but either the terms of that assumption of liability (if express) or the factual circumstances giving rise to an assumption of liability (if implied)." *No Cost Conference,* 940 F.Supp.2d at 1300 (citing *Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, No. CIV S–08–539 LKK/JFM, 2008 WL 2693741, *4 (E.D.Cal. July 1, 2008)). In her first amended complaint, Gerritsen alleges that WB both ex-

sumed the obligations in the Guaranty, such that WB is obligated to perform the duties owed to Gerritsen by Katja under the Guaranty; (c) When New Line was consolidated with WB in 2008, WB became the mere continuation of New Line").

**157.** Opposition at 2–16; see also FAC, ¶ 59(d) ("Since 2008, WB and Katja have been alter egos in that there has existed such a unity of interest and ownership between Katja and WB that their separate personalities no longer exist, and if they are not jointly held accountable for each other's acts as alter egos, an inequitable result will follow for the reasons described above in paragraphs 9 through 48 and 55 through 56"); *id.*, ¶ 66(d) ("Since 2008, WB and New Line have been alter egos in that there has existed such a unity of interest and ownership between New Line and WB

that their separate personalities no longer exist, and if they are not jointly held accountable for each other's acts as alter egos, an inequitable result will follow for the reasons described above in paragraphs 9 through 48 and 55 through 56").

**158.** Opposition at 8 n. 4; see also FAC, ¶ 59(e) ("Since 2008, the nature and extent of WB's control over Katja has been so pervasive and continual that Katja is nothing more than an agent or instrumentality of WB notwithstanding the maintenance of separate corporate formalities"); *id.*, ¶ 66(e) ("Since 2008, the nature and extent of WB's control over New Line has been so pervasive and continual that New Line is nothing more than an agent or instrumentality of WB notwithstanding the maintenance of separate corporate formalities").

pressly and impliedly assumed Katja's and New Line's respective obligations under the Contract and Guaranty.[159]

Although Gerritsen pleads express assumption, she appears to have abandoned the theory because she does not address defendants' arguments concerning it in her opposition.[160] Moreover, express assumption is not adequately pled in the first amended complaint. Gerritsen alleges only that "[u]nder the terms of the contracts and related documents that were signed on or about February 28, 2008, ... WB expressly ... assumed the obligations in the [Contract and Guaranty]."[161] She does not plead the specific terms of the purported assumption as she must do. *No Cost Conference*, 940 F.Supp.2d at 1300 (plaintiff must plead the express "terms of that assumption of liability").

■ As noted in the court's prior order,[162] conclusory allegations regarding unspecified terms of a purported agreement are insufficient to allege a plausible successor liability claim based on an express assumption of liabilities. See, e.g., *id.* at 1299 (concluding that plaintiff's "conclusory" allegation that "as a result of the [corporate] merger, [defendant] assumed all right[s] and responsibilities" under a contract with plaintiff was "insufficient" because plaintiff had to plead "the existence of a contract and ... terms ... establish[ing] the obligation in issue"); *Pacini v. Nationstar Mortgage, LLC*, No. C 12–04606 SI, 2013 WL 2924441, *4 (N.D.Cal. June 13, 2013) ("[P]laintiffs point to the

DOTs for the properties, which state that a change in the holder of the note 'might result in a change in the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.' From this statement, plaintiffs conclude that 'the lender's contractual obligations were assigned by Aurora Bank FSB to Nationstar.' Plaintiffs, however, cite no provision by which Aurora's liabilities were expressly transferred along with the trusteeship. Simply because the contract contemplates that changes in the loan servicer may occur does not imply that a transfer of liability also automatically occurs. Lacking any specific factual allegations, the Court finds that plaintiffs have not sufficiently pled an express 'assumption of liability" (citation omitted)); *Brockway v. JP Morgan Chase Bank*, No. 11CV2982 JM (BGS), 2012 WL 4894253, *3 (S.D.Cal. Oct. 15, 2012) ("The SAC simply alleges that Wells Fargo 'expressly or impliedly agreed to assume all of DREXEL's liabilities under the Deed of Trust.... Such conclusory allegations do 'not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.' While an allegation that Defendants either 'expressly or impliedly agreed to assume all of DREXEL's liabilities' raises the possibility of an assumption of liabilities, it does not show that Plaintiff is entitled to relief under [Rule] 8(a)(2)");

---

**159.** See FAC, ¶ 59(b) ("Under the terms of the contracts and related documents that were signed on or about February 28, 2008, WB and Katja consolidated and WB expressly or impliedly assumed the obligations in the Contract, such that WB is obligated to perform the duties owed to Gerritsen by Katja under the Contract"); *id.*, ¶ 66(b) ("Under the terms of the contracts and related documents that were signed on or about February 28, 2008, WB and New Line consolidated and WB ex-

pressly or impliedly assumed the obligations in the Guaranty, such that WB is obligated to perform the duties owed to Gerritsen by New Line under the Guaranty").

**160.** See Opposition at 19.

**161.** See FAC, ¶¶ 59(b), 66(b).

**162.** Order at 31–33.

*Pantoja v. Countrywide Home Loans, Inc.*, 640 F.Supp.2d 1177, 1192 (N.D.Cal. 2009) (holding that a plaintiff who alleged that Bank of America was "responsible and liable for the actions of Countrywide," and who pled "no facts beyond the purchase of Countrywide by Bank of America," had failed to plead sufficient facts to support a claim against the bank). See also *Owens v. Bank of America, N.A.*, No. 11–cv–4580–YGR, 2012 WL 5340577, *5 (N.D.Cal. Oct. 25, 2012) ("Plaintiffs argue that it can be 'reasonably assumed that' there are agreements between BANA and JPM about rights and obligations with respect to the transferred loan, and that they should be given a chance to learn the terms of those agreements, including whether they support successor liability, in discovery. Plaintiffs misunderstand their pleading obligations").

 As respects implied assumption, Gerritsen argues it "is evident [from WB's] 'complete management, control, ownership, and domination over New Line and Katja' with regard to virtually every business decision"[163] that "WB impliedly assumed [Katja's and New Line's] liabilities following the 2008 consolidation."[164] As an initial matter, the case cited by Gerritsen in support of this assertion—*United States v. Iron Mountain Mines, Inc.*, 987 F.Supp.

1233, 1239–41 (E.D.Cal.1997)—applied *federal successor law* to conclude that, under the *express terms* of two assignment agreements, the assignee had accepted the "obligations and liabilities" of the assignors. *Iron Mountain Mines* is inapposite both because it applies federal, rather than California, successor liability rules, and because there was an *express assumption of liability* in that case.

More fundamentally, the court cannot agree that WB's exercise of control over Katja and New Line plausibly suggests that it intended to assume all of Katja's and New Line's liabilities and obligations following the purported consolidation. Indeed, as discussed *infra*, the facts Gerritsen plead to show "total control" suggest only that WB, as parent, engaged in routine oversight of its subsidiaries, and provided support for their activities.[165] The court previously concluded that this was not sufficient to state a claim for implied assumption of liabilities.[166] Moreover, Gerritsen does not plead facts demonstrating "that liabilities were not limited in the transfer ... and that the intent of the parties was that [all liabilities] should be transferred," *Pacini*, 2013 WL 2924441 at *5 ("Plaintiffs have alleged no facts to support an implied assumption of liability theory. To do so, plaintiffs must allege that liabilities were not limited in

---

163. Opposition at 19.

164. *Id.* at 19.

165. Gerritsen's arguments concerning implied assumption mirror her arguments concerning alter ego liability. (Opposition at 19 (expressly referencing alter ego arguments).) The court analyzes those arguments and factual allegations *infra*.

166. See Order at 33–34 ("[T]he fact that the companies have related operations does not, in and of itself, support a plausible inference that WB assumed Katja's and New Line's obligations such that it can be held liable on the Contract and Guaranty. See *Serna v. Bank of America, N.A.*, No. CV 1110598 CAS

(JEMx), 2012 WL 2030705, *4 (C.D.Cal. June 4, 2012) (allegation that Bank of America 'expressly assumed [Countrywide's] liability by sending [plaintiffs] a letter stating that they could make the trial plan payment' was insufficient to establish express or implied assumption); *Winner*, 2008 WL 2693741 at *4 ('Although plaintiffs argue that an implied assumption of liability may be inferred [from] Zurich's conduct, the mere allegation that Zurich communicated with plaintiffs regarding their claims and that it shared a common address with Universal is not enough from which to infer that Zurich agreed to assume Universal's liabilities')").

the transfer of assets, and that the intent of the parties was that they should be transferred. Here, plaintiffs have only provided the conclusory allegation that 'Defendant NATIONSTAR acquired all of Aurora Loan Services, LLC's assets and liabilities....' Plaintiffs have not directed the Court to any provisions in the DOT or other documents that address the parties' intent or the transfer of liabilities. Accordingly, the Court finds that plaintiffs have not sufficiently pled facts to show that Nationstar impliedly assumed Aurora's liabilities to plaintiffs," citing *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 845–46 (9th Cir.1992)).

Indeed, Gerritsen pleads no facts that give rise to any inference concerning the parties' intent at the time of the purported consolidation in 2008. She does not, for example, allege facts suggesting that WB acquired all of Katja's and New Line's assets in connection with the 2008 consolidation, or that it knew of the 1999 Contract and Guaranty at the time of the consolidation. While such facts might give rise to a plausible inference that WB impliedly assumed Katja's and New Line's liabilities at the time it acquired their assets, *United States v. Sterling Centrecorp., Inc.*, 960 F.Supp.2d 1025, 1038 (E.D.Cal.2013) ("Courts have emphasized that an implied assumption of liabilities is like an express assumption, an agreement between parties with the intent of transferring liability; it 'may be inferred from the conduct, situation, or mutual relation of the parties' outside the parties' official agreement," citing *Truck Ins. Exchange v. Amoco Corp.*, 35 Cal.App.4th 814, 824–25, 41 Cal.Rptr.2d 551 (1995)), they have not been pled. See, e.g., *Carter v. CMTA–Molders & Allied Workers Health & Welfare Trust*, 563 F.Supp. 244, 247 (N.D.Cal.1983) ("Whether Carter, who did not expressly assume those agreements, can be found to have assumed them impliedly is a question of state law.... The undisputed facts establish that Carter was unaware of the agreements when he purchased the assets from Romero. The purchase and sale agreement was silent with respect to the assumption of contractual or other liabilities, and there is no evidence that Carter and Romero discussed the matter.... The evidence does not support a finding that Carter consented to be bound by his predecessor's agreements" (citations omitted)). For all these reasons, the court concludes that Gerritsen has failed adequately to allege an implied assumption of liabilities sufficient to impose successor liability on WB.

### (b) Consolidation or Merger

█ Under California law, successor liability can be imposed following consolidation or merger; this is sometimes called the *de facto* merger exception.[167] Under this exception, liability can attach "where one corporation takes all of another's assets *without providing any consideration* that could be made available to meet claims of the other creditors." *Franklin*, 87 Cal.App.4th at 626, 105 Cal.Rptr.2d 11 (citing *Ray v. Alad Corp.*, 19 Cal.3d 22, 28, 136 Cal.Rptr. 574, 560 P.2d 3 (1977)). Gerritsen argues the first amended complaint alleges that "WB acquired New Line's and Katja's principal assets for inadequate consideration,"[168] citing allegations on information and belief that "no consideration was paid to New Line or Katja in connection with the consolidation," and "thus no money was made available for creditors of New Line and Katja."[169] These allega-

---

167. See *Franklin v. USX Corp.*, 87 Cal.App.4th 615, 626–27, 105 Cal.Rptr.2d 11 (2001) (referring to this theory as the *"de facto* merger exception").

168. Opposition at 20.

169. FAC, ¶ 25.

tions are conclusory, and Gerritsen pleads no facts to support them other than that Time Warner was the sole owner of WB, New Line, and Katja at the time. This does not suffice to meet Gerritsen's burden under *Twombly* and *Iqbal.*

■ The allegations, moreover, reveal a more fundamental problem with Gerritsen's arguments regarding WB's purported liability as a successor-in-interest. As noted, a corporation can be held liable under the *de facto* merger exception if it takes a transfer of all of a second corporation's assets *without providing consideration* that can satisfy the claims of other creditors. *Franklin,* 87 Cal.App.4th at 626, 105 Cal.Rptr.2d 11. Gerritsen bases her successor liability argument on the purported 2008 consolidation of WB, Katja, and New Line.[170] She does not plead that the 2008 consolidation involved or resulted in an asset sale or transfer, however. Indeed, the allegations in the complaint appear to suggest that the consolidation was effected by a stock purchase.[171] Successor liability has its roots in assets sales and transfers, and California courts routinely decline to apply successor liability where the *de facto* merger occurs as a result of a stock purchase or transfer. See, e.g., *Sunnyside Development Co., LLC v. Opsys Ltd.,* No. C 05–0553 MHP, 2007 WL 2462142, *6 (N.D.Cal. Aug. 29, 2007) ("[S]uccessor liability under California law requires the purchase of *assets,* not merely the purchase of stock," citing *Potlatch*

*Corp. v. Superior Court,* 154 Cal.App.3d 1144, 1150–51, 201 Cal.Rptr. 750 (1984)); see also *Bonnifield v. Chevron Corp.,* No. B206255, 2009 WL 1111601, *4 (Cal.App. Apr. 27, 2009) (Unpub.Disp.)[172] (" '[A] merger is the absorption of one corporation by another which survives; retains its name and corporate identity together with the added capital, franchises and powers of the merged corporation; and continues the combined business. The merged corporation ceases to exist, and the merging corporation alone survives.' *There is no merger where one corporation buys only the stock, not the assets of the other, and where both companies continue to exist as separate corporations,*" citing *Phillips v. Cooper Laboratories,* 215 Cal.App.3d 1648, 1659, 264 Cal.Rptr. 311 (1989) (emphasis added)); *Potlatch Corp.,* 154 Cal.App.3d at 1150, 201 Cal.Rptr. 750 ("[T]he fact that Potlatch did not acquire the physical assets of Speedspace and its Summer Bell division and continue the business of Summer Bell as a part of its own business but, instead, acquired the capital stock of Speedspace is no mere matter of form. It implicates fundamental concepts and principles of California and United States law: corporate identity and shareholder immunity"). Cf. *Butler v. Adoption Media, LLC,* 486 F.Supp.2d 1022, 1063 (N.D.Cal. 2007) ("Under California law, when one corporation sells or transfers all its assets to another corporation, the latter is not liable for the debts and liabilities of the

170. See Opposition at 17–20.

171. See FAC, ¶ 27 ("Since 2008, WB has exercised and continues to exercise complete management, control, ownership, and domination over New Line and Katja. WB's stock ownership of New Line and Katja was not for the purpose of participating in the affairs of those corporations in the normal and usual manner, but for the purpose of controlling them so that they may be used as a mere agency or instrumentality of [WB]"); *id.,* ¶ 47 (same).

172. "Although the court is not bound by unpublished decisions for intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.,* No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

transferor unless one of four exceptions applies").

Although Gerritsen argues that "the principal assets of New Line and Katja were acquired by WB in and after the 2008 consolidation,"[173] the facts alleged in the complaint do not support this conclusion. As noted, the first amended complaint suggests that the 2008 consolidation was the result of a *stock purchase or transfer*, not an asset purchase or transfer; Gerritsen does not plausibly plead that "the principal *assets* of New Line and Katja were acquired by WB."

Gerritsen also asserts that "on February 28, 2008, WB caused the Contract to be assigned by Katja to WB."[174] Although Katja's rights under the Contract certainly would be an "asset," the paragraphs of the first amended complaint Gerritsen cites as support for this argument, even accepted as true and viewed in the light most favorable to her, do not plead that Katja assigned the Contract to WB as part of the 2008 consolidation. Paragraph 9, for example, simply states that "WB is engaged in the business of developing, producing, distributing, and marketing motion pictures, which it assigned or otherwise allowed to be produced by its 'Warner Bros. Pictures' unit."[175] Paragraph 53 states that beginning December 17, 2009, the Cuaróns granted all rights in the Cuarón Gravity Project to WB, which it assigned to Warner Bros. Pictures to produce.[176] Finally, paragraph 56 alleges that WB told

Gerritsen she was not entitled to payment under the Contract because Warner Bros. Pictures produced the Film.[177] These allegations, either singly or in combination, do not give rise to a plausible inference that Katja assigned the Contract to WB during the purported consolidation in 2008. Rather, each concerns WB's "assignment" of various projects to Warner Bros. Pictures.

Gerritsen argues finally that in the 2010 Assignment Agreement, "New Line transferred to WB 'all of its rights, title, and interest throughout the world' to 'any and all intellectual property of every kind and nature,'" including "ownership of New Line's films and all underlying literary materials."[178] In addition to the fact that this argument does not concern the transfer of assets by *Katja to WB*, and thus provides no basis for holding WB liable as a successor on Gerritsen's breach of contract claim, the facts alleged in the complaint do not support Gerritsen's assertion that New Line transferred all of its assets to WB in 2010. The 2010 agreement, which the court can consider and accept as true because it has been incorporated by reference in the first amended complaint, specifically states that the "content," i.e., assets, that was being assigned to WB was only those "works of authorship and products ... *acquired by [New Line] on or after the date hereof.*"[179] To the extent the agreement assigned assets to WB, therefore, it did not assign assets New Line had acquired prior to the date it was executed.[180] Although Gerritsen asserts that

---

**173.** Opposition at 17 ("Gerritsen has alleged facts to show that all or substantially all of the operations and assets of Katja and New Line were transferred to WB in and after 2008, such that the Katja and New Line which existed previously survived in name only").

**174.** *Id.* at 19.

**175.** FAC, ¶ 9.

**176.** *Id.,* ¶ 53.

**177.** *Id.,* ¶ 56.

**178.** Opposition at 18.

**179.** See Kline Decl., Exh. A, ¶¶ 1.2, 1.4; see also *id.,* ¶ 2.1.

**180.** In any event, it is unclear how any assignment by *New Line* could have transferred *Katja's contract rights.* Indeed, the first amended complaint and Gerritsen's opposition largely fail to discuss Katja, or WB's purported assumption of its assets and liabilities. This omission is significant, given that

"there could be a dozen other assignment agreements by and between [d]efendants before or after 2010" that transferred all of Katja's and New Line's assets to WB,[181] she pleads no facts suggesting this is the case. In ruling on a Rule 12(b)(6) motion, the court considers only the facts plaintiff pleads in the complaint; it cannot speculate regarding facts that are not alleged. Given that the 2008 consolidation, as alleged, transferred no assets to WB and given that the only allegations in the complaint concerning an asset transfer or purchase concern assets New Line acquired after 2010, no plausible inference arises that Katja and New Line "s[old] or transfer[red] all [of their] assets to [WB]." *Butler*, 486 F.Supp.2d at 1063. Because the complaint does not plausibly plead that WB acquired all or substantially all of Katja's and New Line's assets, and because it pleads no facts demonstrating that any asset transfer was not supported by adequate consideration, Gerritsen has not sufficiently alleged successor liability under the *de facto* merger exception.

### (c) Mere Continuation

 As noted in the court's prior order,[182] California courts view the "mere continuation" basis for imposing successor liability on a company as "a subset of the [consolidation or merger theory]." *Franklin*, 87 Cal.App.4th at 625, 105 Cal.Rptr.2d 11. Thus, "[t]o prevail on such a theory, plaintiff [must] demonstrate [that] '(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; [and that] (2) one or more persons were officers, directors, or stockholders of both corporations.'" *Cen-*

*terPoint Energy, Inc. v. Superior Court,* 157 Cal.App.4th 1101, 1120, 69 Cal.Rptr.3d 202 (2007) (quoting *Ray*, 19 Cal.3d at 28, 136 Cal.Rptr. 574, 560 P.2d 3); see also *Franklin*, 87 Cal.App.4th at 625, 105 Cal. Rptr.2d 11 ("The crucial factor in determining whether a corporate acquisition constitutes either a *de facto* merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets"); *id.* at 627, 105 Cal.Rptr.2d 11 ("[T]he common denominator, which must be present in order to avoid the general rule of successor non-liability, is the payment of inadequate consideration"). For the same reasons that Gerritsen has failed plausibly to allege successor liability under the *de facto* merger exception, she has failed to plead that WB can be held liable as Katja's successor-in-interest on the Contract or New Line's successor on the Guaranty under the "mere continuation" doctrine.

Furthermore, as defendants note,[183] imposition of successor liability under the "mere continuation" doctrine requires that the predecessor entity that was purportedly acquired by the successor entity no longer exist. See *Butler*, 486 F.Supp.2d at 1064 ("With regard to the third exception, the 'mere continuation' doctrine [ ] requires that the selling entity dissolve— because only one corporation may remain after the transaction," citing *Ferguson v. Arcata Redwood Co., LLC,* No. C 0305632 SI, 2004 WL 2600471, *5 (N.D.Cal. Nov. 12, 2004)). Gerritsen's allegations indicate, however, that Katja and New Line still exist.[184] Indeed, the documents she incorporates by reference in her first amended complaint confirm that New Line

Katja, not New Line, owned the rights to Book under the Contract.

181. Opposition at 7 n. 3.

182. Order at 35–36.

183. Motion at 13–14. See also Reply at 21.

184. See FAC, ¶¶ 3–4 (noting that Katja and New Line are corporations "organized and existing under the laws of the State of California").

and Katja "will maintain their own identity and will continue to produce, market, and distribute movies."[185] As a result, WB cannot be considered a "mere continuation" of Katja and New Line because both corporations continue to exist in their prior form. See, e.g., *Butler*, 486 F.Supp.2d at 1066 ("[T]he LLCs cannot be considered a 'mere continuation' of the Adoption.com partnership because the partnership still exists in its previous legal form.... The Adoption.com partnership, which remains legally viable, sold or transferred assets including the ParentProfiles.com website to the newly created LLCs. While there may have been a continuation of part of the enterprise of the partnership (the operation of ParentProfiles.com), the partnership itself was not dissolved··and the LLCs did not assume all of the obligations of the partnership"); *Chularee v. Cookson Co., Inc.*, No. B242764, 2014 WL 726778, *7 (Cal.App. Feb. 26, 2014) (Unpub.Disp.) ("Appellants also argue that TCCI is a mere continuation of Cookson, the rolling door manufacturer.... [T]he undisputed evidence establishes that Cookson's successor, Coboys, and TCCI are separate entities. Coboys, as successor to Cookson, still exists and remains answerable for Cookson's retained liabilities. Thus, an element of the mere-continuation exception (and *de facto* merger exception) cannot be established"); *Phillips*, 215 Cal.App.3d at 1660, 264 Cal.Rptr. 311 ("Nor was Nestle a mere continuation of Miller. While Nestle and Miller had several common officers and directors, Miller continued as a separate corporation after its acquisition").

For all of these reasons, the court concludes that Gerritsen has failed plausibly

to allege that WB was a "mere continuation" of Katja and/or New Line.

### (d) Fraudulent Purpose

Although the first amended complaint does not specifically allege that WB is liable as a successor because it perpetrated a fraud on creditors,[186] Gerritsen argues in her opposition that the "case against WB is premised in part on WB's manipulation of the assets of its subsidiaries for the purpose of avoiding liability to creditors."[187] She asserts that " '[i]n an attempt to avoid liabilities to third parties,' 'WB and New Line (when it was a movie studio), have tried to shield themselves from liability' in order '[t]o mislead and frustrate creditors,' "[188] and contends such allegations plausibly suggest that the consolidation and purported transfer of assets occurred for the "fraudulent purpose of avoiding liability." *Ray*, 19 Cal.3d at 28, 136 Cal.Rptr. 574, 560 P.2d 3. The court is not persuaded.

As noted, Gerritsen pleads no facts indicating that all or substantially all of Katja's and New Line's assets were transferred to WB in 2008 as part of the purported consolidation; at most, the facts alleged suggest a stock transfer occurred. Similarly, although Gerritsen argues that the consolidation was designed to avoid liability to creditors,[189] this is belied by the allegations in the complaint. Gerritsen pleads that "[t]he reason for the consolidation of WB with New Line and Katja was that Time Warner no longer felt it was efficient or economically viable to own and operate two separate movie studios."[190] Gerritsen cites no allegations suggesting that this reason—which is specifically pled—was pretextual or that defendants

---

**185.** See Kline Decl., Exh. C at 3, 5; see also *id.*, Exh. E at 1; *id.*, Exh. F at 1–2.

**186.** See, e.g., FAC, ¶¶ 59, 65.

**187.** Opposition at 20.

**188.** *Id.* (citing FAC, ¶¶ 13, 48.)

**189.** *Id.* at 20–21.

**190.** FAC, ¶ 25.

had other motives for the consolidation, such as avoiding liability to Gerritsen on the Contract and Guaranty. As with the fraud-based allegations in the original complaint, the fraud allegations in the amended complaint are conclusory; they do not support a plausible inference that Katja or New Line transferred rights to the Film to WB, much less that such a transfer was for a fraudulent purpose.[191] See *Iqbal*, 129 S.Ct. at 1949 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Because Gerritsen's fraudulent purpose theory is not supported by factual allegations and because the facts pled in the complaint are not plausibly suggestive of such a purpose,[192] she has

failed adequately to allege that WB can be held liable as a successor-in-interest because it engaged in transactions with Katja and New Line to avoid liability to creditors.[193]

### (e) Conclusion Regarding Successor-in-Interest Liability

Because Gerritsen has failed to plead plausibly that WB is Katja's and New Line's successor-in-interest on the Contract and Guaranty, this theory of vicarious liability does not support her breach of contract and breach of guaranty claims.

### b. Alter Ego Liability [194]

### (1) Legal Standard Governing Alter Ego Liability

■ "The alter ego doctrine arises when a plaintiff comes into court claiming

191. Compare Order at 37–38.

192. See FAC, ¶ 25.

193. Gerritsen argues in a footnote that she has plausibly pled facts satisfying the "fraudulent purpose" test because under "California law[,] ... successor liability due to fraudulent transfer ... [can be] based solely on inadequate consideration." (Opposition at 21 n. 7.) This argument fails because Gerritsen has not adequately alleged that all or substantially all of Katja's and New Line's assets were transferred to WB in 2008, and her allegations of inadequate consideration are conclusory and lack factual support.

194. As a preliminary matter, the court questions whether alter ego is a viable theory upon which to seek relief from WB. In *Postal Instant Press, Inc. v. Kaswa Corporation*, 162 Cal.App.4th 1510, 1518, 77 Cal.Rptr.3d 96 (2008), the California Court of Appeal identified three ways in which a party can pierce the corporate veil. As one court within this district has explained:

"The first and most traditional manner to pierce the corporate veil occurs when a shareholder [is] held liable for the debts or conduct of the corporation. Second, [s]ome courts recognize the corporate veil may be pierced in reverse so that a corpora-

tion may be held liable for the debts or conduct of a shareholder. Typically, reverse piercing involves a corporate insider ... attempting to pierce the corporate veil from within so that the corporate entity and the individual will be considered one and the same. This is referred to as [i]nside reverse piercing. The third[—]sometimes called outside or third party reverse piercing[—]occurs when a third party outsider seeks to reach corporate assets to satisfy claims against an individual shareholder." *Greiling v. Zahoudanis*, No. CV 08–06467 ODW (ANx), 2009 WL 700049, *2 (C.D.Cal. Mar. 13, 2009) (quoting *Postal Instant Press, Inc.*, 162 Cal.App.4th at 1518, 77 Cal.Rptr.3d 96 (internal citations and quotation marks omitted; alterations original)). Gerritsen's alter ego claim against WB does not fit easily into any of these three categories. She does not seek to hold WB, as shareholder, liable for the actions of Katja and New Line. Nor is she an insider seeking to hold Katja and New Line liable for the actions of WB, their shareholder. Finally, although Gerritsen is a third party, it does not appear she seeks to reach corporate assets to satisfy claims against a shareholder; if anything, she seeks to do the converse, i.e., to "reach through" Katja's and New Line's corporate veils to hold their parent company, WB, liable under the Contract and Guaranty, agreements to which it is not a party, by imputing Katja's

that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." *Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 300, 216 Cal.Rptr. 443, 702 P.2d 601 (1985).[195] The purpose of the doctrine is to bypass the corporate entity in order to avoid injustice. Its "essence ... is that justice be done[,] ... [and t]hus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." *Id.* at 301, 216 Cal.Rptr. 443, 702 P.2d 601. See also *Roman Catholic Archbishop of San Francisco v. Superior Court*, 15 Cal.App.3d 405, 411, 93 Cal.Rptr. 338 (1971) ("The terminology 'alter ego' or 'piercing the corporate veil' refers to situations where there has been an abuse of corporate privilege, because of which the equitable owner of a corporation will be held liable for the actions of the corporation," citing *Minton v. Cavaney*, 56 Cal.2d 576, 579, 15 Cal.Rptr. 641, 364 P.2d 473 (1961)).

■ Before the doctrine can be invoked, two elements must be alleged: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of

the corporation alone." *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 526, 99 Cal.Rptr.2d 824 (2000); see also *Mesler*, 39 Cal.3d at 300, 216 Cal.Rptr. 443, 702 P.2d 601 ("There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case. There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow,' " quoting *Automotriz Del Golfo De California S.A. De C.V. v. Resnick*, 47 Cal.2d 792, 796, 306 P.2d 1 (1957)). See also *Harwood*, 33 Fed.Appx. at 906; *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir.1996).

■ Conclusory allegations of "alter ego" status are insufficient to state a claim. Rather, a plaintiff must allege specific facts supporting both of the necessary elements. *In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d 385, 426 (S.D.N.Y.2003) ("These purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard"); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F.Supp.2d 1060, 1067 (C.D.Cal.2002) ("More pertinent for purposes of the current discussion, none [of the allegations] contains any reference to UnumProvident

---

and New Line's obligations under the agreements to WB. While successor liability or agency law may provide a basis for holding WB liable, Gerritsen cites no authority for the proposition that she can use alter ego law in this fashion—i.e., to impute a subsidiary's rights and obligations under a contract to a parent company in order to hold the parent company liable for its breach of the subsidiary's contract. The court declines to dismiss Gerritsen's alter ego claims on this basis,

however, as defendants do not raise the argument in their motion to dismiss.

195. Whether to pierce the corporate veil is a question of state law. See, e.g., *Dusharm v. Elegant Custom Homes, Inc.*, 302 Fed.Appx. 571, 572 (9th Cir.2008) (Unpub.Disp.) (applying Arizona law); *Harwood v. International Estate Planners*, 33 Fed.Appx. 903, 906 (9th Cir.2002) (Unpub.Disp.) (applying California law).

being the alter ego of Provident. None alleges that UnumProvident treats the assets of Provident as its own, that it commingles funds with Provident, that it controls the finances of Provident, that it shares officers or directors with Provident, that Provident is undercapitalized, or that the separateness of the subsidiary has ceased"); *Kingdom 5–KR–41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946(AGS), 2002 WL 432390, *12 (S.D.N.Y. Mar. 20, 2002) ("[I]n order to overcome the presumption of separateness afforded to related corporations, [plaintiff] is required to plead more specific facts supporting its claims, not mere conclusory allegations"); *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 647 (C.D.Cal.1983) ("Defendants further argue that plaintiffs cannot circumvent the requirements for secondary liability by blandly alleging that Madgett, Consolidated, and Frane are 'alter egos' of other defendants accused of committing primary violations. This point is well taken.... If plaintiffs wish to pursue such a theory of liability, they must allege the elements of the doctrine. Conclusory allegations of alter ego status such as those made in the present complaint are not sufficient").

A plaintiff can plead a number of different factors to show unity of interest. "Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Wady*, 216 F.Supp.2d at 1066 (quoting *Roman Catholic Archbishop*, 15 Cal.App.3d at 411, 93 Cal.Rptr. 338). This list is non-exclusive, and California courts have relied on a host of other factors in finding alter ego liability as well. See *Zoran Corp. v. Chen*, 185 Cal.App.4th 799, 811–12, 110 Cal.Rptr.3d 597 (2010) (listing factors that include "the holding out by an individual that he is personally liable for the debts of the corporation ...; the failure to maintain minutes or adequate corporate records, and ... confusion of the records of ... separate entities ...; ... identical equitable ownership [of] ... two entities; ... equitable owners ... dominati[ng] and control[ling] ... two entities; ... the employment of the same employees and/or attorney ...; ... failure to adequately capitalize a corporation; [a] total absence of corporate assets, and undercapitalization ...; ... concealment and misrepresentation of the identity of the responsible ownership, management and financial interest [of an entity], or concealment of personal business activities ...; ... disregard of legal formalities and ... failure to maintain arm's length relationships among related entities ...; the use of the corporate entity to procure labor, services or merchandise for another person or entity ...; ... manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another ...; ... contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or ... use of a corporation as a subterfuge of illegal transactions ...; and ... formation and use of a corporation to transfer to it the existing liability of another person or entity," quoting *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP*, 69 Cal.App.4th 223, 249–50, 81 Cal.Rptr.2d 425 (1999) (in turn quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 838–40, 26 Cal.Rptr. 806 (1962))). "No single factor is determinative, and ... a court must examine all the circumstances to determine whether to apply the doctrine." *VirtualMagic Asia, Inc. v. Fil–Cartoons, Inc.*, 99 Cal.App.4th 228, 245, 121 Cal.Rptr.2d 1 (2002).

### (2) Whether Gerritsen Has Adequately Alleged Alter Ego Liability

#### (a) Unity of Interest and Ownership

■ "The first prong of the alter ego test—whether there is a unity of interest and ownership such that the separate personalities of the two entities no longer exist—'has alternatively been stated as requiring a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former.'" *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13–CV–05058 LHK (HRL), 2015 WL 400251, *5 (N.D.Cal. Jan. 29, 2015). "Specifically, where a 'parent dictates [e]very facet [of the subsidiary's] business—from broad policy decision[s] to routine matters of day-to-day operation[ ],' the unity of interest and ownership test is satisfied." *Id.* (citing *Unocal Corp.*, 248 F.3d at 926–27 (in turn quoting *Rollins Burdick Hunter of Southern California, Inc. v. Alexander & Alexander Services, Inc.*, 206 Cal.App.3d 1, 11, 253 Cal.Rptr. 338 (1988))). "Direct evidence of manipulative control by the parent of its subsidiaries" is illustrative of an alter ego relationship. *Institute of Veterinary Pathology, Inc. v. California Health Labs., Inc.*, 116 Cal.App.3d 111, 120, 172 Cal.Rptr. 74 (1981). Additionally, " 'inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for the acts of the subsidiary.'" *NetApp, Inc.*, 2015 WL 400251 at *5 (quoting *Slottow v. American Cas. Co. of Reading, Pa.*, 10 F.3d 1355, 1360 (9th Cir.1993)).

■ Gerritsen identifies more than ten factors that she contends are indicative of an alter ego relationship between WB, on the one hand, and Katja and New Line, on the other.[196] First, she asserts that "WB is the sole owner of New Line and Katja," which, standing "alone[,] is often enough to defeat a motion to dismiss."[197] As the Ninth Circuit and California courts have routinely observed, however, in and of itself, a parent's complete control of a subsidiary does not show that there is an alter ego relationship between the two. See, e.g., *Katzir's Floor & Home Design, Inc. v. M–MLS.com*, 394 F.3d 1143, 1149 (9th Cir.2004) ("[The] mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law"); *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir.2003) ("Returning to the facts of this case, we know that B & C–London wholly owns B & C, but 100% control through stock ownership does not by itself make a subsidiary the alter ego of the parent" (citations omitted)); *NetApp, Inc.*, 2015 WL 400251 at *6 ("However, 100% control of a subsidiary by a parent does not by itself make a subsidiary the alter ego of the parent," citing *Harris Rutsky & Co.*, 328 F.3d at 1135; *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1285, 31 Cal.Rptr.2d 433 (1994) (concluding that there was no alter ego liability where, *inter alia*, parent company owned 100 percent of the subsidiary's stock)).

■ Gerritsen next asserts that the first amended complaint alleges Katja and New Line share some board members and corporate officers with WB.[198] Overlap between a parent's and a subsidiary's directors or executive leadership alone, however, is not suggestive of a unity of interest and ownership. This is because "[it] is considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors

---

**196.** Opposition at 4–8.

**197.** Opposition at 4.

**198.** *Id.* See also FAC, ¶¶ 34–35, 39.

of the subsidiary." *Sonora Diamond Corp.*, 83 Cal.App.4th at 548–49, 99 Cal. Rptr.2d 824 (citing *Bestfoods*, 524 U.S. at 69, 118 S.Ct. 1876); see also *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir.1980) (the fact that some directors and executives of a parent company sat on the board of the subsidiary did not support a finding of alter ego liability because plaintiff did not allege "that executives and directors of the [parent] ever controlled the [subsidiary] board or formed a board majority"). Gerritsen does not allege that WB's officers and/or executives form a board majority or otherwise control either Katja or New Line. Cf. *Kramer Motors, Inc.*, 628 F.2d at 1177. Thus, the fact that they share directors with WB, by itself, is merely indicative of a common form of corporate governance. See, e.g., *NetApp, Inc.*, 2015 WL 400251 at *6 ("Here, NetApp does not allege that Nimble's directors or officers controlled Nimble AUS, or formed a board majority. Accordingly, NetApp has merely alleged some intercorporate connections between Nimble and Nimble AUS, which is not sufficient to satisfy the unity of interest or ownership test," citing *Institute of Veterinary Pathology*, 116 Cal.App.3d at 120, 172 Cal. Rptr. 74 (no alter ego liability where plaintiff "only establishes intercorporate connections between Revlon, USV, and NHL. [Plaintiff] fails to set forth any direct evidence of Revlon's manipulative control of its subsidiaries which would require imposition of liability")).

Gerritsen next cites various allegations in the amended complaint—i.e., that defendants share the same office location and telephone number;[199] that Katja and New Line purportedly operate as a "single enterprise" with WB, acting as its "production unit[s]" or "divisions";[200] that WB issues statements on behalf of Katja and New Line on stationary bearing only its logo;[201] that defendants share common business departments; that WB employees provide services for New Line;[202] that New Line provided funds to Katja; and that WB commingled its funds with Katja's.[203] As alleged, the court cannot conclude that these circumstances demonstrate the existence of an alter ego relationship between WB, on the one hand, and Katja and New Line, on the other.

■ As defendants note,[204] the fact that a parent and subsidiary share the same office location, or the same website and telephone number, does not necessarily reflect an abuse of the corporate form and existence of an alter ego relationship. See, e.g., *NetApp, Inc.*, 2015 WL 400251 at *7 ("[T]he allegation that Nimble and Nimble AUS share a website and email is an administrative[ ] function. Shared administrative functions are not necessarily indicative of an alter ego relationship," citing *Tomaselli*, 25 Cal.App.4th at 1285, 31 Cal. Rptr.2d 433); *Cherrone v. Florsheim Development*, No. CIV 2:12–02069 WBS CKD, 2012 WL 6049021, *4 n. 2 (E.D.Cal. Dec. 5, 2012) ("As for the first element, plaintiffs allege that defendants shared the same office space, but fail to allege facts as to other factors, including commingling of funds and other assets of the two entities, the holding out by one entity that it is

---

**199.** See Opposition at 4; see also FAC, ¶¶ 33–39.

**200.** See Opposition at 5, 7–8; see also FAC, ¶¶ 25–26, 29, 36–37.

**201.** See Opposition at 6; see also FAC, ¶¶ 19, 36.

**202.** See Opposition at 6; see also FAC, ¶¶ 32–33, 36–38.

**203.** See Opposition at 7; see also FAC, ¶¶ 12, 47.

**204.** Motion at 23–24; Reply at 13–14.

liable for the debts of the other, or identical equitable ownership in the two entities").

▮ Similarly, the fact that WB may denominate Katja and New Line "units" or "divisions";[205] that it issues press releases on their behalf in its name;[206] that defendants share common business departments and employees;[207] and that New Line provides funding to Katja[208] are not necessarily indicative of an alter ego relationship; rather, they are common aspects of parent-subsidiary relationships. See, e.g., NetApp, Inc., 2015 WL 400251 at *6 ("As a preliminary matter, NetApp fails to explain how several of its allegations—such as that Nimble handles certain administrative tasks for Nimble AUS, that Nimble is paying Reynolds' attorney's fees, or that Nimble issues press releases on behalf of Nimble AUS—are relevant to the eight factors in the unity of interest and ownership inquiry. NetApp states that these allegations are 'indisputably ... indicative of alter ego.' However, NetApp does not otherwise explain how these alleged facts are applicable. Moreover, an allegation that Nimble and Nimble AUS share certain administrative functions, such as policies related to recruitment, legal defense, insurance, and discipline, is not indisputably indicative of alter ego. In addition, NetApp does not cite any authority (and this Court did not locate any) which suggests that a parent-subsidiary's joint issuance of press releases, or the parent's payment of the attorney's fees and control of the legal defense of a subsidiary's employee, is illustrative of an alter ego relationship. Put another way, without more explanation, NetApp's factual allegations do not suggest that Nimble 'dictates every facet of [Nimble AUS'] business—from broad policy decision[s] to routine matters of day-to-day operations,' which is what the Ninth Circuit requires to satisfy the unity of interest and ownership test," citing Unocal Corp., 248 F.3d at 926–27; Sonora Diamond Corp., 83 Cal.App.4th at 538–39, 99 Cal.Rptr.2d 824; Tomaselli, 25 Cal.App.4th at 1285, 31 Cal.Rptr.2d 433); id. at *7 ("[T]he fact that Nimble characterizes Nimble AUS as a division, i.e. sales office, is not unusual in a parent-subsidiary relationship and does not establish the existence of an alter ego relationship," citing Unocal Corp., 248 F.3d at 928 (parent's reference to a subsidiary as a division of the parent does not establish the existence of an alter ego relationship)); Sandoval v. Ali, 34 F.Supp.3d 1031, 1040 (N.D.Cal. 2014) ("Plaintiffs allege 'on information and belief' that the individual Ali Defendants are the alter egos of the corporate defendants, which Plaintiffs collectively refer to as the 'the Autowest Collision Group' and that the corporate Defendants are underfunded, are not stand alone corporations, have common management and pay practices, share labor and materials, including a distribution and billing system, and operate a common marketing system. Plaintiffs further allege that 'there exists a unity of interests and ownership [such] that the separate personalities of the corporations and the Autowest Collision Group Employers [the individual Ali Defendants] no longer exist,' and that 'an inequity would result if the corporations are not viewed as alter egos of each other and the' individual Ali Defendants, 'including the inability on the part of the Corporate Defendants to satisfy a potential judgment in this case which seeks wages and derivative penalties.' Plaintiffs' alter ego allegations are too conclusory to survive a motion to dismiss. 'Conclusory allegations

---

205. FAC, ¶¶ 25–26, 29, 36–37.

206. Id., ¶¶ 19, 36.

207. Id., ¶¶ 32–33, 36–38.

208. Id., ¶¶ 12, 47.

of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each,' " citing *Neilson v. Union Bank of California, N.A.,* 290 F.Supp.2d 1101, 1116 (C.D.Cal.2003)); *BBA Aviation PLC v. Superior Court,* 190 Cal.App.4th 421, 434–35, 117 Cal.Rptr.3d 914 (2010) ("[T]he mere appearance of a parent's logo on its subsidiary's documents' does not 'constitute[ ] pervasive control over day-to-day operations"); see also *Hill v. State Farm Mutual Auto. Insurance Co.,* 166 Cal. App.4th 1438, 1494, 83 Cal.Rptr.3d 651 (2008) (noting that "[c]apital infusions from a parent to a subsidiary are a normal, and indeed, a necessary part of the parent-subsidiary relationship" (citations omitted)).

Gerritsen also argues that she plausibly alleges "unity of interest" because the first amended complaint pleads that WB has commingled its assets with Katja and New Line,[209] and that it diverted Katja's and New Line's assets to itself following the purported consolidation in 2008.[210] While the court agrees that such facts, if pled, would weigh in favor of a finding that Gerritsen had adequately alleged "unity of interest," the facts pled in the first amended complaint do not show that WB has "manipulated" Katja's and New Line's assets and liabilities such that it "owns and/or controls all assets of Katja and New Line" or commingles those companies' assets with its own.[211] For example, although Gerritsen alleges that on February 28, 2008, "Time Warner caused WB, New Line, and Katja to consolidate,"[212] she does *not* plead that the consolidation resulted in an assets transfer or in the commingling of Katja's and New Line's funds with those of WB. Although the 2010 Assignment Agreement transfers certain intellectual property rights acquired by New Line *after 2010* to WB, as the court has discussed, neither the Agreement nor any allegation in the first amended complaint gives rise to an inference that WB diverted all of New Line's assets to itself.[213]

Finally, although Gerritsen argues that "[a]llegations of 'abusive control' are routinely found to meet alter ego pleading requirements,"[214] as the preceding discussion makes clear, the indicia of WB's purported "control" of Katja and New Line that Gerritsen pleads are, for the most part, circumstances that are merely incidental to a typical parent-subsidiary relationship. Although Gerritsen alleges that "WB has directed all business activities of New Line" and Katja,[215] the examples cited—e.g., determining "how many movies will be produced in a year" and the genre of the movies[216]—are the type of macro-level management decisions that a parent company can permissibly make without exposing itself to alter ego liability. See, e.g., *Barantsevich v. VTB Bank,* 954 F.Supp.2d 972, 988 (C.D.Cal.2013) ("[E]vidence of general policy-setting is insufficient to show the requisite unity of interest between the two companies, or to show [that the parent] exercised the necessary degree of control.... A parent corporation 'may be directly involved in the macro-

---

209. Opposition at 5.

210. *Id.* at 6–7.

211. *Id.* at 5–6.

212. FAC, ¶ 22.

213. Indeed, the Agreement makes clear that the only assets being assigned are those that New Line will acquire in the future, i.e., after January 1, 2010. (See Kline Decl., Exh. A at ¶ 1.2.)

214. Opposition at 10.

215. FAC, ¶¶ 29, 37, 39, 41.

216. Opposition at 6–7, 10.

management ... of its subsidiaries ... without exposing itself to a charge that each subsidiary is merely its alter ego.' ... Thus, the alter ego test is satisfied 'where the record indicates that the parent dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation' ").

While the court recognizes that some of the facts that Gerritsen has alleged are of the type that can, in an appropriate case, adequately plead "unity of interest" between a parent corporation and its subsidiary, as alleged here, they do not give rise to a plausible inference that WB "dictates [e]very facet [of Katja's and New Line's] business—from broad policy decision[s] to routine matters of day-to-day operation[ ]." *NetApp, Inc.*, 2015 WL 400251 at *5 (citing *Unocal Corp.*, 248 F.3d at 926–27; *Rollins Burdick Hunter*, 206 Cal.App.3d at 11, 253 Cal.Rptr. 338). This is particularly true as the complaint lacks sufficient allegations pleading "manipulative control by the parent of its subsidiaries," *Institute of Veterinary Pathology, Inc.*, 116 Cal.App.3d at 120, 172 Cal.Rptr. 74, and "inadequate capitalization of a subsidiary" at the time of the transaction in question. See *Slottow*, 10 F.3d at 1360. While Gerritsen alleges that Katja has been undercapitalized at all relevant times,[217] she fails to plead facts plausibly suggesting this is so. She merely states, on information and belief, that "Katja has been and is undercapitalized for the business in which it is engaged."[218] This type of conclusory allegation, unsupported by facts, does not adequately plead that Katja was undercapitalized and thus does not demonstrate that there was a "unity of interest" between Katja and WB. See, e.g., *NetApp, Inc.*, 2015 WL 400251 at *7 ("In addition, NetApp argues that the fact that Nimble AUS allegedly recognizes no revenue and pays no taxes in Australia

'suggest[s] undercapitalization.' It is true that inadequate capitalization may be a basis for holding a parent corporation liable for the acts of its subsidiary. However, when determining whether inadequate capitalization exists such that alter ego liability would be appropriate, courts generally look to facts or allegations related to an entity's liabilities and assets. Here, NetApp makes no allegations regarding Nimble AUS' assets or its liabilities. Nor does NetApp explain why its factual allegations would suggest undercapitalization, and without more this is mere speculation that is insufficient to defeat a motion to dismiss," citing *Iqbal* ); *Hoang v. Vinh Phat Supermarket, Inc.*, No. CIV 2:13–00724 WBS GGH, 2013 WL 4095042, *14 (E.D.Cal. Aug. 13, 2013) ("To sufficiently allege a theory of alter ego, plaintiffs must provide 'more than labels and conclusions'—'[f]actual allegations must be enough to raise a right to relief above the speculative level.' Plaintiffs' allegations of a unity of ownership and interest and control over working conditions are conclusory, as is their claim that Vinh Phat is undercapitalized. The factual allegation that they offer to show undercapitalization—that the individual defendants have 'funneled' Vinh Phat's funds into the personal accounts of themselves, their family, and their associates—is insufficient. Without further factual context, such 'funneling' could merely be the usual practice of corporations to pay dividends to shareholders, and engaging in such a practice does not necessarily mean that a corporation is undercapitalized," citing *Twombly* and *Dollar Tree Stores Inc. v. Toyama Partners LLC*, C 10–0325 SI, 2011 WL 872724, *2 (N.D.Cal. Mar. 11, 2011)).

As a result, the court concludes that Gerritsen has failed adequately to allege a

---

**217.** See FAC, ¶¶ 12, 47.

**218.** *Id.*

"unity of interest" sufficient to satisfy the first prong of California's alter ego test.

### (b) Inequitable Result

■ Even had Gerritsen satisfactorily pled unity of interest, the court could not find she had adequately alleged that an inequitable result will follow if the corporate separateness of the defendant entities is not disregarded. "[A] plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each. Thus, in addition to alleging facts that show a unity of interest, Gerritsen must also plead facts demonstrating that an inequitable result will follow if an alter ego finding is not made." See *Orloff v. Allman,* 819 F.2d 904, 908–09 (9th Cir. 1987) (discussing California's alter ego standard). The "inequitable result" prong of alter ego liability exists to address circumstances in which "adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *First Western Bank & Trust Co. v. Bookasta,* 267 Cal.App.2d 910, 914–15, 73 Cal.Rptr. 657 (1968) (citations omitted). Bad faith is a critical factor in the analysis. See *Neilson,* 290 F.Supp.2d at 1117 ("California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding," citing *Mid–Century Ins. Co. v. Gardner,* 9 Cal.App.4th 1205, 1213, 11 Cal. Rptr.2d 918 (1992) ("The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil" (internal citation and quotation marks omitted))).

■ Gerritsen makes four arguments concerning the "inequitable result" prong of the alter ego test. She asserts that "failure to pierce the corporate veil would allow WB to avoid liability by manipulating assets and liabilities between the entities so as to concentrate assets in one and the liabilities in another." [219] In this regard, she contends that "the corporate veil can be pierced even where 'there is no evidence that any creditor has ever gone unpaid.'" [220] Alternatively, she argues that she is an unsatisfied creditor," and that an inequitable result will occur if she is not allowed to pierce the corporate veil. The authority on which Gerritsen relies as support for the proposition that a company can be found to be an alter ego even if "there is no evidence that any creditor has ever gone unpaid," involved companies that were severely undercapitalized. See, e.g., *Brea Imperial, Inc. v. Auto. Wheels, Inc.,* Nos. G041803, G042385, G041926, G042148, G042153, 2011 WL 484350, *9 (Cal.App. Feb. 10, 2011) (Unpub.Disp.) (concluding that it would be inequitable to respect the corporate formalities given evidence that defendant "had been undercapitalized for years, including the time when it negotiated with BII and signed the agreement which was at issue").

"The California Supreme Court has made clear that undercapitalization alone may be sufficient to lead to an inequitable result:

" 'If a corporation is organized and carries [on] business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient

---

**219.** Opposition at 14.

**220.** *Id.* at 14–15.

basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt shareholders from corporate debts.... If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.'" *MP Nexlevel of California, Inc. v. CVIN, LLC*, No. 14–CV–288 LJO GSA, 2014 WL 5019639, *16 (E.D.Cal. Oct. 7, 2014) (quoting *Automotriz*, 47 Cal.2d at 797, 306 P.2d 1).

See *id.* ("Thus, 'the status of an entity as undercapitalized is an independent basis for inequitable result' under the alter ego doctrine," citing *Dollar Tree Stores Inc.*, 2011 WL 872724 at *2 (in turn citing *United States v. HealthwinMidtown Convalescent Hosp. & Rehab. Ctr., Inc.*, 511 F.Supp. 416, 420 (C.D.Cal.1981))).

 Stated differently, although insolvency "does not of itself constitute an inequitable result," "[c]ourts have found this prong satisfied when a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business." See *Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Serv., Inc.*, 736 F.2d 516, 525 & n. 13 (9th Cir. 1984) (internal quotation marks omitted); cf. *Slottow*, 10 F.3d at 1360 ("Under California law, 'inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for the acts of the subsidiary'"); *Wady*, 216 F.Supp.2d at 1069 ("Disregard for the corporate form through undercapitalization or commingling of assets can lead to a finding of alter ego liability").

Gerritsen has not plausibly alleged that either Katja or New Line was undercapitalized at the time she entered into the Contract and Guaranty, nor that they are undercapitalized now. While such allegations might adequately plead the inequitable result element of alter ego liability, the facts alleged in the first amended complaint do not give rise to a plausible inference that either entity was undercapitalized; Gerritsen's only allegations concerning undercapitalization are conclusory. For this reason, she has not adequately pled that an inequitable result will follow if corporate formalities are respected; this is true notwithstanding the fact that "the corporate veil can be pierced even where there is no evidence that any creditor has ever gone unpaid.'"[221]

 Gerritsen also asserts that an inequitable result will follow if WB is not deemed the alter ego of Katja and New Line because she is an unsatisfied creditor. California courts routinely "reject[ ] the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine." *Neilson*, 290 F.Supp.2d at 1117; see, e.g., *VirtualMagic Asia, Inc. v. Fil–Cartoons, Inc.*, 99 Cal. App.4th 228, 245, 121 Cal.Rptr.2d 1 (2002) ("[A]lter ego will not be applied absent evidence that an injustice would result from the recognition of separate corporate identities, and '[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy this standard,'" quoting *Sonora Diamond Corp.*, 83 Cal.App.4th at 539, 99 Cal.Rptr.2d 824); *Mid–Century Ins. Co. v. Gardner*, 9 Cal.App.4th 1205, 1213, 11 Cal. Rptr.2d 918 (1992) ("'Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced,' and thus set up such an unhappy circumstance as proof of an 'inequitable result.' In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor," quoting *Associated Vendors, Inc. v. Oak-*

---

**221.** Opposition at 15.

*land Meat Co.*, 210 Cal.App.2d 825, 842, 26 Cal.Rptr. 806 (1962)). Thus, the fact that Gerritsen may be an "unsatisfied creditor" does not, in and of itself, warrant the imposition of alter ego liability.

Gerritsen argues additionally that "failure to pierce the corporate veil would permit [d]efendants to leave Gerritsen without a remedy"[222] and " 'sanction a fraud,' i.e., the transfer of assets for the fraudulent purpose of avoiding liability to Gerritsen.' "[223] As noted, however, she does not plead facts supporting a plausible inference that Katja transferred *any assets* to WB, nor that New Line transferred all of its assets,[224] to avoid liability.

The final argument Gerritsen makes as to why she has adequately pled the inequitable result element of alter ego liability is that "it is unjust for WB to receive the benefits of the services provided by Gerritsen without paying for them."[225] These allegations merely plead "ultimate facts," the truth of which the court need not assume at the pleadings stage. See, e.g., *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.2003) ("[Courts need not] assume the truth of legal conclusions merely because they are cast in the form of factual allegations"); *Johnson v. Sun Community Federal Credit Union*, No. 11 CV 2112 LAB (WVG), 2012 WL 1340434, *3 (S.D.Cal. Apr. 18, 2012) ("Johnson also argues that 'the Federal Rules do not draw distinctions between pleading facts, ultimate facts, or conclusions of law.' Completely false. The Supreme Court held in *Iqbal* that 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' In-deed, a complaint that simply offers labels and conclusions, or a formulaic recitation of the elements of a cause of action, is inadequate. 'Nor does a complaint suffice,' the Supreme Court held, 'if it tenders naked assertions devoid of further factual enhancement,' " citing *Twombly* ).

Although Gerritsen alleges that "Katja [and New Line] knew or should have known [that] the Film was based on the Book," and that WB received the benefit of the Contract and Guaranty from Katja and New Line respectively,[226] she fails to plead *facts* supporting these conclusions. She does not, for example, plead how or when Katja's and New Line's rights and obligations under the Contract and Guaranty were transferred to WB, nor when WB first became aware of the Book or made the decision to divert the Film project from New Line to Warner Bros. Pictures. Absent such factual allegations, no plausible inferences support Gerritsen's assertion that "WB received the benefits of the Book without paying for it."[227] Finally, the case Gerritsen cites for the proposition that allegations of "unjust enrichment" are "sufficient to meet the 'inequitable result' prong"[228]—*Lim v. Pak*, No. B255771, 2015 WL 275417, *3 (Cal.App. Jan. 21, 2015) (Unpub.Disp.)—does not stand for that proposition. In *Lim*, the California Court of Appeal concluded that Lim had failed to allege "inequitable result" adequately because he did not plead that the purported alter ego "actually received or benefitted from th[e] butane" due under a purchase contract such that "it would ... be inequitable to allow [it] to avoid paying for it." *Lim*, 2015 WL 275417 at *3 ("In this case, there are no such allegations. While Lim

**222.** *Id.* at 15.

**223.** *Id.* at 16.

**224.** *Id.*

**225.** *Id.* at 15–16.

**226.** FAC, ¶¶ 60, 67.

**227.** Opposition at 16.

**228.** *Id.*

alleges that Sunmax received butane from U.S. Portable without paying for it, he at no point alleges that Pak or Park actually received or benefitted from that butane, and it would therefore be inequitable to allow them to avoid paying for it. He does not allege that Pak and/or Park were the actual purchasers of the butane, using Sunmax only as a shell. He does not allege that the butane, or the profits from it, were improperly transferred to Pak and/or Park"). The circumstances in *Lim* are similar to those here, as Gerritsen fails to plead facts plausibly suggesting that WB received the rights to the Book or benefits under the Contract and Guaranty from Katja and New Line without paying for them.

For all these reasons, the court concludes that Gerritsen has failed to plead alter ego liability sufficiently.

### c. Agency Liability

#### (1) Legal Standard for Agency Liability

■ Under California law, an agent is defined as "one who represents another, called the principal, in dealings with third persons." CAL. CIV. CODE § 2295. "In determining if an agent relationship exists, the court considers three essential characteristics: (1) an agent or apparent agent holds a power to alter the legal relationships between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal had the right to control the conduct of the agent with respect to matters entrusted to him." *Grober v. Mako Productions, Inc.*, No. CV 04–08604 SGL (OPx), 2008 WL 9027249, *6 (C.D.Cal. Aug. 29, 2008) (citing *Garlock*

*Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148 Cal.App.4th 937, 945, 56 Cal.Rptr.3d 177 (2007)); *Palomares v. Bear Stearns Residential Mortgage Corp.*, No. CV 07–1899 WQH (BLM), 2008 WL 686683, *4 (S.D.Cal. Mar. 13, 2008).

#### (2) Whether Gerritsen Has Adequately Alleged Agency Liability

■ Defendants argue that Gerritsen has failed plausibly to allege that WB can be held liable as a principal with respect to the Contract and Guaranty into which Katja and New Line entered.[229] Defendants contend that Gerritsen's agency theory is implausible because she fails to allege that in 1999, when Katja and New Line entered into the agreements, they were acting as WB's agent, under its authority or control, or as its fiduciary.[230] They further assert that, even had Gerritsen alleged Katja and New Line were acting as WB's agents, her allegations of control are "far too conclusory," and she does not plead "concrete 'facts supporting the conclusion that Katja and New Line were 'completely dominated and controlled' by WB.'"[231] In a footnote, Gerritsen counters that she "has alleged facts to support an agency theory," referencing arguments supporting her alter ego theory, and asserting that she has adequately pled "WB's control over Katja and New Line, in that they are operated as 'incorporated departments' of WB."[232] She also asserts that "even if New Line and Katja entered into the Contract [and Guaranty] ... outside the course and scope of their agency relationship with WB, WB ratified the transaction and assumed the obligations of the Contract [and Guaranty] when it exercised the rights and benefits by producing the Film."[233]

**229.** Motion at 24–25; Reply at 22.

**230.** Motion at 24.

**231.** *Id.*

**232.** Opposition at 8 n. 4.

**233.** *Id.*

The court concludes that as currently pled, Gerritsen's agency theory is implausible. As defendants note, Gerritsen does not allege that Katja and New Line had any sort of legal relationship with WB at the time they purportedly executed the Contract and Guaranty in 1999; there are no allegations concerning the companies' relationship with WB prior to 2008, when Time Warner purportedly caused them to consolidate with WB.[234] Nor does Gerritsen plead any facts indicating that Katja and/or New Line held themselves out as WB's agents or that WB represented they were entering into the Contract and Guaranty on its behalf. California courts have not imposed liability on an agency theory where the apparent creation of the agency post-dates the transaction for which a party seeks to hold the principal vicariously liable. See, e.g., *Lopez v. Broukhim*, No. B239728, 2013 WL 1881757, *6 (Cal.App. May 7, 2013) (Unpub.Disp.) ("In 2002 and 2003, when Ms. Rosas received medical treatment care at Golden Care Medical Group, no person or entity affiliated with the clinic said or did anything that could have caused Ms. Rosas to believe that Dr. Broukhim, Inc., or Dr. Broukhim, individually, was an agent of the clinic. And, no person or entity affiliated with Dr. Broukhim, Inc., or Dr. Broukhim, individually, said or did anything that could have caused Ms. Rosas to believe that the clinic was an agent of the corporation or the doctor, individually. In 2002 and 2003, *there was no factual or legal relationship whatsoever* between Dr. Broukhim, Inc., or Dr. Broukhim, individually, and Golden Care Medical Group. Jessica's ostensible agency argument is a *non sequitur*" (emphasis original)).

Gerritsen does not address this issue in her opposition and thus fails to explain how either Katja and New Line could have had "power to alter the legal relationships between [WB] and third persons," how either was "a fiduciary" of WB, or how "WB had the right to control the conduct of [Katja and New Line]" *at the time they entered into the Contract and Guaranty with Gerritsen.* See *Grober*, 2008 WL 9027249 at *6. Instead, Gerritsen relies on allegations that WB exercised its "right to control" Katja and New Line *following the purported consolidation in 2008.* Even were the extent of WB's control of Katja and New Line since 2008 sufficient to create an agency relationship,[235] a subsequent agency relationship of this type would not plausibly plead that Katja or New Line

---

234. See FAC, ¶¶ 20–22.

235. As currently pled, Gerritsen's allegations do not appear adequate to allege such a relationship. "The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." *Sonora Diamond Corp.*, 83 Cal.App.4th at 542, 99 Cal.Rptr.2d 824 (citing *Rollins Burdick Hunter*, 206 Cal.App.3d at 9, 253 Cal.Rptr. 338). "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Id.* (citations omitted). To make this showing, Gerritsen relies exclusively on the facts she alleged to show that WB is the alter ego of Katja and New Line. She asserts that, because they are sufficient to demonstrate unity of interest for purposes of alter ego liability, they are also sufficient to demonstrate an agency relationship. (Opposition at 8 n. 4.) As noted, however, the facts pled in her complaint do not adequately demonstrate that WB exercised control over Katja's and New Line's daily operations or support a finding that defendants moved beyond a parent-subsidiary relationship to a principal-agent relationship.

was acting as WB's agent nine years earlier.

Gerritsen's alternate argument—i.e., that "even if New Line and Katja entered into the Contract [and Guaranty] with Gerritsen outside the course and scope of their agency relationship with WB, WB ratified the transaction and assumed the obligations of the Contract when it exercised the rights and benefits [of the agreements] by producing the Film"—is also unavailing. Gerritsen correctly observes that "[a]n agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification." CAL. CIV.CODE § 2307. The fact that there was no agency relationship between WB and Katja and New Line in 1999, therefore, does not preclude the creation of such an agency through WB's subsequent ratification of the Contract and Guaranty. Nonetheless, as defendants note in reply,[236] Gerritsen fails to allege facts plausibly suggesting that such a ratification occurred. "[T]he [principal's] acquiescence or acceptance of benefits must be with full knowledge of the material facts." B. Witkin, SUMMARY OF CALIFORNIA LAW, AGENCY, § 141; see also *Reusche v. California Pacific Title Ins. Co.*, 231 Cal.App.2d 731, 737, 42 Cal.Rptr. 262 (1965) ("[T]he law requires that a principal be apprised of all the facts surrounding the transaction before he will be held to have ratified the unauthorized acts of an agent"). Gerritsen does not address this requirement in her first amended complaint or in her opposition, and thus does not identify facts alleged in the complaint that show WB knew of the existence of the 1999 Contract and Guaranty when it accepted all rights to the Cuarón Gravity Project in 2009. Because Gerritsen does not plead facts showing

that WB was apprised of all material facts regarding the 1999 Contract and Guaranty, she does not adequately allege that WB ratified the agreements such that it can be held liable as a principal of Katja and New Line.

In sum, Gerritsen has not plausibly alleged claims for breach of contract and breach of guaranty against WB under an agency theory. As a result, the claims must be dismissed to the extent they are based on allegations that Katja and New Line were WB's agents.

### 3. Conclusion Regarding Plaintiff's Claims for Breach of Contract and Breach of Guaranty

For the reasons stated, the court concludes that Gerritsen has failed adequately to allege breach of contract and breach of guaranty claims against defendants on a direct liability theory. The complaint similarly does not allege plausible claims against WB on successor-in-interest, alter ego, and agency liability theories. As a result, Gerritsen's first and second causes of action must be dismissed.[237]

### III. CONCLUSION

For the reasons stated, the court strikes plaintiff's new claims for breach of the implied covenant of good faith and fair dealing under Rule 12(f) of the Federal Rules of Civil Procedure. It grants defendants' motion to dismiss the first amended complaint. Gerritsen may file an amended complaint within twenty (20) days of the date of this order if she is able to remedy the deficiencies the court has noted in this order.

Gerritsen may not plead new claims. Should the scope of any amendment ex-

---

**236.** Reply at 22 n. 23.

**237.** Because Gerritsen's breach of contract and guaranty claims are not adequately pled, and her accounting claim is derivative of those claims, the court grants defendants' motion to dismiss the accounting claim as well.

ceed the leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f). *See* FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); see also *DeLeon*, 2010 WL 4285006 at \*3; *Barker*, 2010 WL 3171067 at \*1–2.